# United States District Court

FOR THE

**NORTHERN DISTRICT OF CALIFORNIA**
**CRIMINAL DIVISION**

VENUE: SAN FRANCISCO

FILED

04 JUN 10 AM 11: 34

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DIST. OF CALIFORNIA

UNITED STATES OF AMERICA,

**V.**

PRABHAT GOYAL




DEFENDANT.

# INDICTMENT

Violations: Conspiracy to Commit Securities Fraud- 18 U.S.C. § 371; Securities Fraud 15 U.S.C. §§ 78j(b), 78ff; and 17 C.F.R. § 240.10b-5; False Statements to Auditors- 15 U.S.C. §§ 78m(b)(2), 78 ff; and 17 C.F.R. § 240.13b-2.2; False Books and Records- 15 U.S.C. §§ 78m(b)(2)(A); 78m(b)(5), 78ff; and 17 C.F.R. § 240.13b2-1; Aiding and Abetting- 18 U.S.C. § 2

---

A true bill.

_Ramewill_

Foreman

Filed in open court this ___10th___ day of
___June___.

_Karen Hor_

Clerk

KAREN L. HOM
JOSEPH C. SPERO
UNITED STATES MAGISTRATE JUDGE

Bail, $ _arrest warrant, $2 million bail._

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT
    ☐ SUPERSEDING

### OFFENSE CHARGED

See Attached.

☐ Petty
☐ Minor
☐ Misde-
   meanor
☒ Felony

PENALTY:
See Attached.

CR ~~[redacted]~~

---

**Name of District Court, and/or Judge/Magistrate Location**

NORTHERN DISTRICT OF CALIFORNIA

04 JUN 10  AM 11: 36

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DEFENDANT - U.S.

▶ PRABHAT GOYAL

DISTRICT COURT NUMBER

# 04-0201

**SI**

---

### PROCEEDING

Name of Complaintant Agency, or Person (&Title, if any)

Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:   **SHOW DOCKET NO.**

   ☐ U.S. Att'y  ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under   **MAGISTRATE CASE NO.**

Name and Office of Person Furnishing Information on THIS FORM   KEVIN V. RYAN

☒ U.S. Att'y  ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)   Jeffrey L. Bornstein

---

### DEFENDANT

**IS _NOT_ IN CUSTODY**

1) ☒ Has not been arrested, pending outcome this proceeding.
      If not detained give date any prior summons ▶
      was served on above charges

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

---

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges  } ☐ Fed'l  ☐ State

      If answer to (6) is "Yes", show name of institution

Has detainer   ☐ Yes  If "Yes"
been filed?    ☐ No   give date
                      filed

**DATE OF ARREST** ▶   Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶   Month/Day/Year

☐ This report amends AO 257 previously submitted

---

### ADDITIONAL INFORMATION OR COMMENTS

**PROCESS:**

☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT   Bail Amount: $ 1,000,000.00

If Summons, complete following:

☐ Arraignment  ☐ Initial Appearance   *Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Defendant Address:

Date/Time: _____

Before Judge: _____

Comments:

CM

**OFFENSE CHARGED**: (con't)

Count One:  18 U.S.C. § 371- Conspiracy to Commit Securities Fraud;

Count Two:  15 U.S.C. §§ 78j(b) and 78 ff; 17 C.F.R. § 240.10b-5- Securities Fraud; 18 U.S.C. § 2- Aiding and Abetting;

Counts Three through Ten:  15 U.S.C. §§ 78j(b) and 78 ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2 -False SEC Filings and Aiding and Abetting.

Counts Eleven through Nineteen:  15 U.S.C. §§ 78m(b)(2) and 78 ff; 17 C.F.R. § 240.13b2-2; 18 U.S.C. § 2 - False Statement to Auditors and Aiding and Abetting.

Count Twenty: 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78 ff, and 17 C.F.R. § 240.13b2-1; 18 U.S.C. § 2- False Books and Records and Aiding and Abetting.


**PENALTY**

Count One:  5 years imprisonment, $250,000 fine, 3 years supervised release, $100 special assessment, restitution.

Count Two through Twenty: 10 years imprisonment, $1,000,000 fine, 3 years supervised release, $100 special assessment, restitution.



1  KEVIN V. RYAN (CSBN 79002)
   United States Attorney

2

3

4

5  

6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11

12 | UNITED STATES OF AMERICA **CR** )    **04 - 0201**

13 |     Plaintiff,                )  VIOLATIONS: Conspiracy to Commit
                                    )  Securities Fraud – 18 U.S.C. § 371;
14 |     v.                         )  Securities Fraud – 15 U.S.C. §§ 78j(b), 78ff;
                                    )  and 17 C.F.R. § 240.10b-5; False Statements
15 | PRABHAT GOYAL,                 )  to Auditors – 15 U.S.C. §§ 78m(b)(2), 78ff;
                                    )  and 17 C.F.R. § 240.13b-2.2; False Books
16 |     Defendant.                 )  and Records – 15 U.S.C. §§ 78m(b)(2)(A),
                                    )  78m(b)(5), 78ff; and 17 C.F.R. § 240.13b2-1;
17 |_____    )  Aiding and Abetting – 18 U.S.C. § 2

18              SAN FRANCISCO VENUE

19
                    I N D I C T M E N T
20
   The Grand Jury charges:
21
                  I. BACKGROUND
22
        At all times relevant to this Indictment:
23
        A. The Company
24
        1. Network Associates, Inc. ("Network Associates" or "the company") was a Delaware
25
   corporation with its principal offices in Santa Clara, California. Network Associates
26
   manufactured and sold computer programs ("software") and hardware relating to computer
27
   network security and management. Network Associates' fiscal year ended on December 31.
28
   Network Associates' independent auditor was PriceWaterhouseCoopers ("PWC").

   INDICTMENT   

                                              

1      2. Network Associates was a publicly traded company whose stock was registered with

2  the Securities and Exchange Commission (the "SEC") pursuant to Section 12(b) of the Securities

3  Exchange Act of 1934. Network Associates' shares originally traded on the National Association

4  of Securities Dealers Automated Quotation System ("NASDAQ") under the symbol "NETA."

5  On February 12, 2002, Network Associates' shares began trading on the New York Stock

6  Exchange under the symbol "NET."

7      3. As a public company, Network Associates was required to comply with regulations of

8  the SEC. Those regulations are designed to protect members of the investing public by, among

9  other things, ensuring that a company's financial information is accurately recorded and

10  disclosed to the public.

11      4. Under SEC regulations, Network Associates and its officers had a duty to: (a) make

12  and keep books, records and accounts that fairly and accurately reflected the company's business

13  transactions; (b) devise and maintain a system of internal accounting controls sufficient to

14  provide reasonable assurances that the company's transactions were recorded as necessary to

15  permit preparation of financial statements in conformity with Generally Accepted Accounting

16  Principles ("GAAP"); and (c) file quarterly reports (Form 10-Q) and annual reports (Form 10-K)

17  with the SEC which included reliable financial statements. The Forms 10-Q required unaudited

18  financial statements, and the Forms 10-K required audited financial statements.

19      B. The Defendant

20      5. In or about December 1997, defendant Prabhat Goyal was named Network Associates'

21  Chief Financial Officer ("CFO") and Vice President of Finance and Administration ("Vice

22  President"). In or about the late fall of 2000, defendant Goyal resigned from Network Associates

23  as CFO and Vice President effective January 2001, but remained as a special advisor to Network

24  Associates for a one year period. Defendant Goyal is a Chartered Accountant – the equivalent of

25  a Certified Public Accountant – in the United Kingdom.

26      C. Network Associates' Revenue Recognition Policy

27      6. From 1998 to 2000, the defendant Goyal and others formulated quarterly revenue

28  goals for the company. These goals were set in contemplation of analyst and market estimates.

INDICTMENT                                   2

1  The defendant and other executives were awarded bonuses if the goals were obtained.

2  7. For each quarter from 1998 - 2000, with the exception of the first fiscal quarter of
3  1999 and the last fiscal quarter of 2000, Network Associates met its revenue goals primarily
4  through large software license transactions with the company's distributors. Network Associates
5  immediately recognized the revenue for these transactions.

6  8. Beginning in 1998, Network Associates adhered to Software Revenue Recognition
7  Statement of Position 97-2 (Amer. Inst. of Certified Public Accountants 1997) ("SOP 97-2").
8  SOP 97-2 prescribes requirements for recognizing revenue from the sale of software licenses.
9  Among other requirements, revenue from a sale of software may not be recognized if the sale
10  was subject to a contingency such as a right of return, if the sale price was not fixed or
11  determinable, or if collection was not probable.

12  9. The defendant was familiar with, and represented that he understood and complied
13  with the requirements of SOP 97-2 in filings made with the SEC and other public statements.

14  ## II. THE CONSPIRACY AND SCHEME TO DEFRAUD

15  10. Beginning in or about 1998 and continuing to in or about January 2001, the
16  defendant and others conspired to and did devise and intend to devise a scheme to defraud
17  Network Associates' shareholders, its creditors, the public, and the SEC, and to deprive Network
18  Associates of its intangible right to their honest services, by falsely manipulating Network
19  Associates' financial statements, including software license sales and services revenue, net
20  income or loss and earnings or loss per share.

21  11. In essence, the defendant took advantage of the so called "sell-in" method of
22  accounting whereby Network Associates recorded revenue based on the amount of product sold
23  to distributors as opposed to the actual amount of product sold by the distributors to real
24  customers ("sell-out"). Each quarter, defendant and others would approve sales to distributors
25  that would be memorialized in e-mails and so-called "buy-in" letters. The buy-in letters included
26  promised cash payments and other concessions from Network Associates, which violated GAAP
27  and Network Associates' revenue recognition policy.

28

INDICTMENT                                  3

1    12. The defendant and others knowingly concealed the buy-in letters and other material

2  information about the true nature of Network Associates' business relationship with its

3  distributors from PWC, its outside auditor, and from Network Associates' Board of Directors, in

4  order to fraudulently increase revenue and other financial results.  As a result of the defendant's

5  conduct, Network Associates improperly recorded over \$470 million in revenue and also

6  understated its losses by over \$330 million during 1998 to 2000.

7    13. The means and methods by which the defendant and others achieved and attempted

8  to achieve the goals of the scheme included:

9        a.    Approving millions of dollars in payments to distributors falsely disguised
10           as discounts, rebates and marketing fees in order to convince the
distributors to hold excess inventory, not return unsold products, and
11           purchase more products than the distributors could actually sell to
customers during a given quarter;

12        b.    Concealing from Network Associates' outside auditors and its own Board
of Directors the true nature, extent and source of the improper payments to
13           distributors;

14        c.    Granting to distributors special terms and conditions reflected in oral and
written side agreements that were not fully disclosed to the company's
15           auditors and which, if disclosed, would have negated immediate
recognition of revenue;
16
        d.    Using NetTools, Inc., a subsidiary and shell company wholly owned by
17           Network Associates, to push channel distributors' sales to end users as a
means of relieving excess channel inventory;
18
        e.    Entering into round-trip transactions with customers in which Network
19           Associates invested in the customer in order to provide the funding needed
by the customer to purchase Network Associates products;
20
        f.    Making and causing to be made fraudulent entries in Network Associates'
21           financial books and records;

22        g.    Making materially false and misleading statements and material omissions
to outside auditors;
23
        h.    Filing materially false and misleading financial statements with the SEC;
24           and

25        i.    Making materially false and misleading public statements about Network
Associates' financial performance.
26
    14. The object and purpose of the conspiracy and scheme to defraud was to falsely inflate
27
Network Associates' revenue and profits, to meet or exceed projected quarterly financial results,
28
to induce investors to continue to purchase and hold Network Associates' stock, to artificially

INDICTMENT                                        4

1   sustain Network Associates' stock price, to permit the defendant to enrich himself by obtaining

2   bonuses and stock options, and to maintain the defendant's position in the company and

3   reputation with the investing public.

4       A.      Disguised Payments and Discounts to Distributors

5           15. It was part of the conspiracy and scheme to defraud that the defendant and others

6   regularly met and spoke in person, and by telephone in order to review pertinent financial

7   information, including information contained in spreadsheets called the "Four Corner Model."

8   During these meetings, the defendant discussed the amount of inventory in the distribution

9   channel, the anticipated demand by customers for the next quarter, the ever-increasing payments

10  and other concessions that Network Associates made to its distributors in order to convince the

11  distributors to continue to buy more product and not to return excess product that the distributors

12  held, and the amount of product the company needed to "sell-in" to channel distributors in order

13  to meet the company's internal revenue and other financial goals and outside analysts'

14  expectations.

15          16. In order for Network Associates to meet its goals each quarter, the defendant knew

16  that the above-described payments and other concessions could not be fully and accurately

17  disclosed to Network Associates' outside auditors and Network Associates Board of Directors

18  without risking the likelihood of a reduction of revenue and a restatement of previous financial

19  statements and public filings because of various improper business practices that the defendant

20  and others conspired to conceal. These practices include the following:

21          a.      Sales-in to distributors were linked to Network Associates' ability to sell-
                    out product held by distributors;
22
23          b.      Network Associates used NetTools to meet its commitment to distributors
                    to sell-out product;
24          c.      Network Associates paid its principal distributor excess inventory holding
                    fees;
25
26          d.      Payments to its principal distributor were improperly characterized as
                    marketing expenses when they were used for other purposes;
27          e.      Network Associates' distributors were not obligated to pay upon sell-in
                    but upon sell-out – in other words, the distributors treated these sales as
28                  consignment sales;

INDICTMENT                                      5

1
2

      f.     If the distributors did not receive cash payments and other discounts when negotiating new purchases, they would have returned product and not agreed to new purchases;

3
4

      g.    Network Associates encouraged its distributors to pay invoices for inventory which was not yet sold to reduce DSOs (Days Sales Outstanding) by providing discounts related to revenue recognized in prior periods; and

5
6

      h.    Network Associates made payments to its distributors to meet revenue goals and prevent them from returning product.

7         17. In or about March 1999, the defendant Goyal caused Network Associates' then-

8 Controller to pay a principal channel distributor approximately $15 million to induce the

9 distributor to buy more Network Associates' product and keep the distributor from returning

10 excess inventory. If the true nature of these payments had been disclosed to PWC – that is, as

11 payments to a distributor to hold and not return excess inventory and as an inducement for

12 additional channel sales – Network Associates could not have recognized revenue for current or

13 prior sales-in to its distributors under GAAP because these sales to the distributor were not fixed

14 or determinable, the distributor had far greater return rights than the contract would have

15 permitted, there were undisclosed side agreements and the payments to the distributors were

16 falsely described. Network Associates' financial statements were therefore materially false and

17 misleading regarding the revenue and expenses reported from these types of sales to distributors.

18         18. In early April 1999, the defendant Goyal and others announced that Network

19 Associates had missed its financial goals for the first quarter of 1999 and that the company would

20 be taking steps to reduce channel inventory during the second quarter of 1999. Defendant Goyal

21 monitored the inventory in the channel on a regular basis but continued to push Network

22 Associates' employees to sell more product into the channel than the distributors could sell

23 through to end-users, so that by the end of the third quarter of 1999, the defendant knew the

24 distribution channel was again stuffed.

25         19. During the fourth quarter of 1999, Network Associates' new Controller, with

26 defendant Goyal's knowledge and approval, paid one of Network Associate's principal channel

27 distributors over $21 million in eight separate checks. Defendant Goyal learned that the new

28 Controller had falsely described these payments in the books and records of the company as

INDICTMENT           6

1    reimbursement for "marketing fund rebates and other promotional programs." In fact, as
2    defendant Goyal knew, these payments were intended to compensate the distributor for, among
3    other things, agreeing to a new buy-in letter and not returning excess inventory for a refund. If
4    the true nature of these payments had been disclosed to PWC – that is, as payments to a
5    distributor to hold and not return excess inventory and as an inducement for additional channel
6    sales – Network Associates could not have recognized revenue for current or prior sales-in to its
7    distributors under GAAP because these sales to the distributor were not fixed or determinable,
8    the distributor had far greater return rights than the contract would have permitted, there were
9    undisclosed side agreements and the payments to the distributors were falsely described.
10   Network Associates' financial statements were therefore materially false and misleading
11   regarding the revenue and expenses reported from these types of sales to distributors.

12       20. In or about March 2000, near the end of the first quarter of 2000, Network Associates'
13   new Controller agreed to pay the same large software distributor an "excess inventory fee" for
14   holding and not returning over $54 million of Network Associates' products as a condition to
15   agreeing to a new buy-in agreement. In a March 8, 2000 "side letter," made with defendant
16   Goyal's knowledge and approval, the new Controller agreed to pay the distributor approximately
17   $1.1 million as a "non-refundable debit for excess inventory." With these and other substantial
18   discounts and rebates, the distributor then agreed to a new buy-in letter for the quarter. If the true
19   nature of these payments had been disclosed to PWC – that is, as payments to a distributor to
20   hold and not return excess inventory and as an inducement for additional channel sales –
21   Network Associates could not have recognized revenue for current or prior sales-in to its
22   distributors under GAAP because these sales to the distributor were not fixed or determinable,
23   the distributor had far greater return rights than the contract would have permitted, there were
24   undisclosed side agreements and the payments to the distributors were falsely described.
25   Network Associates' financial statements were therefore materially false and misleading
26   regarding the revenue and expenses reported from these types of sales to distributors.

27       21. In or about June 2000, Network Associates' new Controller agreed to pay the same
28   large software distributor an "excess inventory fee" for holding and not returning millions of

INDICTMENT                                    7

1   dollars of Network Associates' products as a condition to agreeing to a new buy-in letter. At that
2   time, if the distributor agreed to a new buy-in letter, it would hold many months of Network
3   Associates' products in inventory. The spreadsheets reviewed by the defendant and others
4   confirmed the high level of the channel inventory. With defendant Goyal's knowledge and
5   approval, the new Controller eventually agreed to pay the distributor an "excess inventory fee" of
6   approximately $1.9 million and other fees totaling $750,000 in exchange for the distributor's
7   payment of approximately $25 million owed to Network Associates from an earlier sale.
8   Network Associates' payments were sent with letters which falsely described the payments as
9   reimbursements "related to early payment of invoices," "meet comp promotional programs," and
10  "marketing and other promotional programs" so as to enable Network Associates to recognize
11  revenue prematurely in violation of GAAP. If the true nature of these payments had been
12  disclosed to PWC – that is, as payments to a distributor to hold and not return excess inventory,
13  as discounts on amounts owed on earlier sales and an inducement for additional channel sales –
14  Network Associates could not have recognized revenue for current or prior sales-in to its
15  distributors under GAAP because these sales to the distributor were not fixed or determinable,
16  the distributor had far greater return rights than the contract would have permitted, there were
17  undisclosed side agreements and the payments to the distributors were falsely described.
18  Network Associates' financial statements were therefore materially false and misleading
19  regarding the revenue and expenses reported from these types of sales to distributors.

20      22. In or about September 2000, the defendant Goyal learned that the same distributor
21  remained concerned about the high level of inventory in the channel, and that it wanted to return
22  excess inventory. The "Four Corner Model" documents reviewed by the defendant confirmed
23  that the channel inventory levels continued to be high. With defendant Goyal's knowledge and
24  approval, the new Controller eventually agreed to pay the distributor an additional "excess
25  inventory fee" of approximately $2.1 million and other improper fees totaling $1.65 million in
26  exchange for the distributor's payment of approximately $33 million owed to Network
27  Associates from an earlier sale. Network Associates' payments were sent with letters which
28  falsely described the nature of these payments reimbursements "related to early payment of

INDICTMENT                                8

1    invoices," "meet comp promotional programs," and "marketing and other promotional programs"
2    so as to enable Network Associates to recognize revenue prematurely in violation of GAAP. If
3    the true nature of these payments had been disclosed to PWC – that is, as payments to a
4    distributor to hold and not return excess inventory, as discounts on amounts owed on earlier sales
5    and as an inducement for additional channel sales – Network Associates could not have
6    recognized revenue for current or prior sales-in to its distributors under GAAP because these
7    sales to the distributor were not fixed or determinable, the distributor had far greater return rights
8    than the contract would have permitted, there were undisclosed side agreements and the
9    payments to the distributors were falsely described. Network Associates' financial statements
10   were therefore materially false and misleading regarding the revenue and expenses reported from
11   these types of sales to distributors.

12   C. False Accounting Entries

13   23. With defendant Goyal's knowledge and approval, Network Associates' Controller
14   violated GAAP and SEC accounting rules by secretly using inflated tax reserve accounts to
15   increase Network Associates' inadequate sales return reserves to, among other things, account for
16   the costs of the payments, rebates and discounts Network Associates made to its distributors, and
17   to hide the true nature of these payments from PWC as follows:

18           a.   In or about November 1999, Network Associates' Controller increased the
                  company's sales return reserves by $15 million through a fraudulent
19                reduction in the tax reserve accounts;

20           b.   On or about November 30, 1999, Network Associates' Controller
                  increased the company's sales returns reserves to cover $21.6 million in
21                payments to a distributor through multiple fraudulent reductions in the tax
                  reserve accounts; and
22
             c.   On or about October 3, 2000, Network Associates' Controller increased
23                the company's sales returns reserves by approximately $10 million by a
                  fraudulent reduction in the tax reserve accounts.
24
     D. Defendant's False Statements to Network Associates' Auditors
25
     24. It was a further part of the conspiracy and scheme and artifice to defraud that
26
     defendant Goyal and others made and caused to be made materially false and misleading
27
     statements to Network Associates' auditor PWC in connection with the filing of the company's
28
     SEC Forms 10-Q and 10-Ks during 1998, 1999 and 2000.

INDICTMENT                                      9

1           25. In a letter dated April 15, 1999, the defendant and others made the following false

2    representations to Network Associates' outside auditors, PWC:

3              a.    "The consolidated financial statements [for fiscal year 1998 and earlier]
                     ...are fairly presented in conformity with generally accepted accounting
4                     principles, and include all disclosures necessary for such fair presentation
                     and disclosures otherwise required to be included therein by the laws and
5                     regulations to which the Company is subject." [¶ 1 of the letter].

6              b.    "We have made available to you all...[f]inancial records and related data.
                     [¶ 2].
7

8              c.    "There are no material transactions, agreements or accounts that have not
                     been properly recorded in the accounting records underlying the
                     consolidated financial statements." [¶ 4].
9

10            d.    "Receivables recorded in the consolidated financial statements represent
                     bona fide claims against debtors for sales or other charges arising on or
                     before the balance sheet dates and are not subject to discount except for
11                     normal cash discounts..." [¶ 5].

12            e.    "The Company's recognition of revenue at time of sell-in for sales into
                     distribution channels where the right of return exists meets the conditions
13                     required under generally accepted accounting principles, including
                     reasonably dependable estimates of expected returns." [¶ 11].
14

15            f.    "We have fully disclosed to you all sales terms, including all rights of
                     return or price adjustments, and all warranty provisions." [¶ 12].

16            g.    "There has been no...[f]raud involving management or employees who
                     have significant roles in the Company's internal controls..[f]raud involving
17                     others that could have a material effect on the consolidated financial
                     statements..." [¶ 17].
18

              h.    "There are no agreements to repurchase assets previously sold." [¶ 20].
19
           26. In a letter to PWC dated May 12, 1999, for the first quarter ended March 31, 1999,
20
    the defendant and others falsely represented to the auditors that he [and others] had "reviewed
21
    our representation letter to you dated April 15, 1999...We now confirm those representations 1
22
    through 29, which, to the degree appropriate, apply to the interim consolidated financial
23
    statements..., and incorporate them herein." [¶ 3].  In addition the defendant and others falsely
24
    represented that:
25
              a.    "The interim consolidated financial statements [for the first quarter ended
26                     March 31, 1999] are fairly presented in conformity with generally accepted
                     accounting principles, and include all disclosure necessary for such fair
27                     presentation and disclosures otherwise required to be included therein by
                     the laws and regulations to which the Company is subject." [¶ 2].
28

INDICTMENT                          10

b.  "The Company's recently announced plan to reduce channel inventory levels in the second quarter is based on a decision reached by management on April 19, 1999 in response to significant unanticipated changes in the Company's expected rates of revenue growth and length of sales cycles. We believe that reserves for sales returns at March 31, 1999 are consistent with estimated returns in the normal course and historical experience. Returns significantly exceeding the levels are not expected to occur except as result of any direct actions the Company may take to reduce channel inventories and would not constitute returns initiated by distributors in normal course." [¶ 4].

c.  "The Company's investments in NeoPlanet, Direct Web, and Tesserae have been appropriately accounted for using the cost method...The Company is not aware of any information that would indicate an other than temporary decline in the fair value of these investments below their carrying amounts." [¶ 8].

27. In a letter to PWC dated August 12, 1999, in substance, the defendant and others reiterated the same false representations as they had made in the May 12, 1999 letter for the second quarter ended June 30, 1999.

28. In a letter to PWC dated October 21, 1999, in substance, the defendant and others reiterated the same false representations they had made in the May 12, 1999 and August 12, 1999 letters for the third quarter ended September 30, 1999 with the exception that with respect to the sales reserves for returns, the defendant and others falsely represented that: "We believe the reserves for sales returns at September 30, 1999 are consistent with estimated returns in normal course and historical experience. Returns significantly exceeding these levels are not expected to occur except as a result of any direct action that the Company may take to reduce channel inventories and would not constitute returns initiated by distributors in normal course." [¶ 4].

29. In a letter to PWC dated January 24, 2000, the defendant and others made the following false representations to the Company's outside auditors for fiscal year 1999 and for each of the three prior years:

a.  "The consolidated financial statements...are fairly presented in conformity with accounting principles generally accepted...and include all disclosure necessary for such fair presentation..." [¶ 1].

b.  "There are no material transactions, agreements or accounts that have not been properly recorded in the accounting records underlying the consolidated financial statements." [¶ 4].

INDICTMENT                                11

c.  "Receivables recorded in the consolidated financial statements represent bona fide claims against debtors for sales or other charges...and are not subject to discount except for normal cash discounts...all receivables have been appropriately reduced to their estimated not realizable value." [¶ 7].

d.  "We have fully disclosed to you all sales terms, including all rights of return or price adjustments, and all warranty provisions." [¶ 10].

e.  "We believe that reserves for sales returns at December 31, 1999 are consistent with estimated returns in normal course and historical experience and future returns significantly exceeding these levels of reserves are not expected to occur." [¶ 13].

f.  "The Company's investment in NeoPlanet, DirectWeb and Tesserae have been appropriately accounted for..." [¶ 15].

g.  "The Company's recognition of revenue at time of sell-in for sales into distribution channels where the right of return exists meets the conditions required under [generally accepted accounting principles]..." [¶ 16].

h.  "There has been no...[f]raud involving management or employees who have significant roles in the Company's internal controls [or] [f]raud involving others that could have a material effect on the consolidated financial statements..." [¶ 20].

i.  "There are no agreements to repurchase assets previously sold." [¶ 25].

30. In a letter to PWC dated March 30, 2000, the defendant and others falsely represented that "[n]o information has come to our attention [since the January 24, 2000 letter] that would cause us to believe that any of those previous representations should be modified."

31. In a letter to PWC dated May 8, 2000, the defendant and others falsely represented that "[n]o information has come to our attention [since the January 24, 2000 letter] that would cause us to believe that any of those previous representations should be modified."

32. In a letter to PWC dated August 14, 2000, the defendant and others reiterated the false representation that "[n]o information has come to our attention [since the January 24, 2000 letter] that would cause us to believe that any of those previous representations should be modified."

33. In a letter dated November 14, 2000, the defendant and others reiterated all 33 paragraphs of their January 24, 2000 representation letter [¶ 3], and made the following additional false representations:

INDICTMENT                                    12

a. "...[I]nterim consolidated financials...are fairly presented in conformity with generally accepted accounting principles, and include all disclosures necessary for such fair presentation and disclosures otherwise required to be included..." [¶ 2].

b. "We believe that reserves for sales returns at September 30, 2000 are consistent with estimated returns in normal course and historical experience. Returns significantly exceeding these levels are not expected to occur except as a result of any direct action that the Company may take to reduce channel inventories and would not constitute returns initiated by distributors in normal course." [¶ 4].

c. "To the best of our knowledge and belief, no events have occurred subsequent to the interim balance sheet date and through the date of this letter that would require adjustment to or disclosure in the aforementioned interim consolidated financial statements."

34. In fact, the representations the defendant and others made to PWC set forth above in paragraphs 24 - 33 were false, misleading and materially incomplete because as the defendant Goyal knew:

a. Network Associates' accounting records failed to reflect side letters and oral side agreements, and these agreements were deliberately concealed from PWC;

b. The channel was stuffed and the channel inventory levels were substantially higher than the actual and projected sales out to customers. In addition, the channel distributors had far greater rights of return than had been disclosed. If Network Associates did not pay its distributors excess inventory holding fees and other improper fees, it would have to take back millions of dollars in product returns and the distributors would not agree to purchase more products;

c. Network Associates failed to disclose to PWC that Network Associates had entered into round-trip transactions with certain customers and that but for the investment funds provided, these customers had no ability to pay for Network Associates' products;

d. Management and other key employees were actively engaged in violating Network Associates' accounting procedures and circumventing its system of internal accounting controls;

e. Management was violating applicable SEC rules and directing others to do so; and

f. At the direction of management, Network Associates recorded revenue in violation of Generally Accepted Accounting Principles ('GAAP"), including, but not limited to, Statement of Position 97-2.

//

INDICTMENT                                   13

1    COUNT ONE: 18 U.S.C. § 371 (Conspiracy to Commit Securities Fraud)

2    35. The allegations of paragraphs 1 through 34 are realleged as if fully set forth here.

3    36. Beginning in or about January 1998, and continuing to in or about January 2001, in

4    the Northern District of California and elsewhere, the defendant

5    PRABHAT GOYAL

6    and others, did knowingly and intentionally conspire to commit offenses against the United States,

7    namely, (a) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff;

8    and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) falsification of Network

9    Associates' books, records, and accounts, in violation of Title 15, United States Code, Sections

10   78m(b)(2), 78m(b)(5) and 78ff; and Title 17, Code of Federal Regulations, Section 240.13b2-1;

11   and (c) making and causing to be made materially false and misleading statements to Network

12   Associates' outside auditors, in violation of Title 15, United States Code, Sections 78m(b)(2) and

13   78ff; and 17 C.F.R. § 240.13b2-2.

14   OVERT ACTS

15   37. In furtherance of the conspiracy and to effect the objects thereof, in the Northern

16   District of California and elsewhere, the defendant Goyal and others committed the acts described

17   in paragraphs 15 through 33 of this Indictment, which are hereby realleged as if fully set forth here

18   and the following additional overt acts in furtherance of the conspiracy:

19       a.    On or about April 15, 1999, defendant Goyal signed a "management
             representation letter" to PWC in connection with PWC's annual review of
20            Network Associates' financial statements for fiscal year 1998.

21       b.    On or about April 19, 1999, defendant Goyal caused Network Associates to
             issue a press release with the financial results for the first quarter ended
22            March 31, 1999.

23       c.    On or about May 12, 1999, defendant Goyal signed a "management
             representation letter" to PWC in connection with PWC's quarterly review
24            of Network Associates' financial statements for the first quarter ended
             March 31, 1999.
25
         d.    On or about July 21, 1999, defendant Goyal caused Network Associates to
26            issue a press release with the financial results for the second quarter ended
             June 30, 1999.
27

28   //

INDICTMENT                                14

e.  On or about August 12, 1999, defendant Goyal signed a "management representation letter" to PWC in connection with PWC's quarterly review of Network Associates' financial statements for the second quarter ended June 30, 1999.

f.  On or about October 18, 1999, defendant Goyal caused Network Associates to issue a press release with the financial results for the third quarter ended September 30, 1999.

g.  On or about October 21, 1999, defendant Goyal signed a "management representation letter" to PWC in connection with PWC's quarterly review of Network Associates' financial statements for the third quarter ended September 30, 1999.

h.  On or about January 24, 2000, defendant Goyal signed a "management representation letter" to PWC in connection with PWC's annual review of Network Associates' financial statements for fiscal year ended December 31, 1999.

i.  On or about January 24, 2000, defendant Goyal caused Network Associates to issue a press release with the financial results for the fiscal year ended December 31, 1999.

j.  On or about April 18, 2000, defendant Goyal caused Network Associates to issue a press release with the financial results for the first quarter ended March 31, 2000.

k.  On or about May 8, 2000, defendant Goyal signed a "management representation letter" to PWC in connection with PWC's quarterly review of Network Associates' financial statements for the first quarter ended March 31, 2000.

l.  On or about July 18, 2000, defendant Goyal caused Network Associates to issue a press release with the financial results for the second quarter ended June 30, 2000.

m.  On or about August 14, 2000, defendant Goyal signed a "management representation letter" to PWC in connection with PWC's quarterly review of Network Associates' financial statements for the second quarter ended June 30, 2000.

n.  On or about October 16, 2000, defendant Goyal caused Network Associates to issue a press release with the financial results for the third quarter ended September 30, 2000.

o.  On or about November 11, 2000, defendant Goyal made spoke with securities analysts, about Network Associates' anticipated financial results for the fourth quarter of 2000.

p.  On or about November 14, 2000, defendant Goyal signed a "management representation letter" to PWC in connection with PWC's quarterly review of Network Associates' financial statements for the third quarter ended September 30, 2000.

All in violation of Title 18, United States Code, Section 371.

INDICTMENT                                  15

COUNT TWO: (15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5 – Securities Fraud; 18 U.S.C. § 2 - Aiding and Abetting)

38. Paragraphs 1 through 34 and 37 are incorporated here by reference.

39. Beginning in or about January 1998 and continuing to in or about January 2001, in the Northern District of California, and elsewhere, the defendant

PRABHAT GOYAL,

and others, did knowingly and willfully, directly and indirectly, by the use of the facilities of a national securities exchange, did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities issued by Network Associates, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud in connection with the purchase and sale of Network Associates' securities; (b) making and causing to be made untrue, false and misleading statements of material fact in reports and documents required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon purchasers of Network Associates securities.

40. In order for Network Associates to meet its revenue and income goals each quarter, the defendant and others made payments and gave other concessions to its distributors and failed to fully and accurately disclose these business practices to Network Associates' outside auditors, its shareholders and the investing public. Network Associates' financial statements during 1998 through and including 2000 were materially false and misleading. In particular, sales revenue results were materially misstated and net income/loss was materially misstated because the defendant and others failed to disclose that:

a. Sales-in to distributors were linked to Network Associates' ability to sell-out product held by distributors;

b. Network Associates used NetTools to meet its commitment to distributors to sell-out product;

c. Network Associates paid its principal distributor excess inventory holding fees;

d. Payments to its principal distributor were improperly characterized as marketing expenses when they were used for other purposes;

e.    Network Associates' distributors were not obligated to pay upon sell-in but upon sell-out – that is, the distributors treated these sales as consignment sales;

f.    If the distributors did not receive payments and other discounts when negotiating new purchases, they would have returned product and not agreed to new purchases;

g.    Network Associates encouraged its distributors to pay invoices for inventory which was not yet sold to reduce DSOs (Days Sales Outstanding) by providing discounts related to revenue recognized in prior periods; and

h.    Network Associates made payments to its distributors to meet revenue goals and prevent them from returning product.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18 United States Code, Section 2.

//

INDICTMENT                    17

1  COUNTS THREE THROUGH TEN: 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. §240.10b-5;
                              18 U.S.C. § 2 (False SEC Filings and Aiding and Abetting)

2

3      41. Paragraphs 1 through 34, 37 and 40 are realleged as if fully set forth here.

4      42. On or about the dates set forth below, in the Northern District of California and

   elsewhere, the defendant
5

6                              PRABHAT GOYAL

7  did knowingly and wilfully make and cause to be made materially false and misleading statements

8  in reports and documents required to be filed with the SEC under the Securities and Exchange Act

9  of 1934 and the rules and regulations promulgated thereunder, in violation of Title 15, United

   States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5,
10
   and Title 18, United States Code, Section 2.
11

| COUNT | DATE (on or about) | SEC FILING |
|-------|-------------------|------------|
| THREE | April 15, 1999 | SEC Form 10-K for the Fiscal Year End December 31, 1998 that falsely reported net revenue in the amount of $990,045,000, net income in the amount of $36,438,000, and earnings per share of $.27 when in fact the net revenue was only $456,129,000,and there was actually a net loss and a net loss per share. |
| FOUR | May 13, 1999 | SEC Form 10-Q for the First Quarter Ended March 31, 1999 that falsely reported net revenue in the amount of $245,192,000, net income in the amount of $26,241,000, and earnings per share of $.19, when in fact the net revenue was only $180,558,000, and there was actually a net loss and a net loss per share. |
| FIVE | October 4, 1999 | SEC Form S-8 incorporating SEC Form 10-K for the Fiscal Year End December 31, 1998 that falsely reported net revenue in the amount of $990,045,000, net income in the amount of $36,438,000, and earnings per share of $.27 when in fact the net revenue was only $456,129,000, and there was actually a net loss and a net loss per share. |
| SIX | November 15, 1999 | SEC Form 10-Q for the Third Quarter Ended September 30, 1999 that falsely reported net revenue in the amount of $195,201,000, net loss in the amount of $241,000, and net earnings/loss per share of zero, when in fact the net revenue was $194,287,000, and there was actually a greater net loss than had been reported and a net loss per share. |

INDICTMENT                              18

| COUNT | DATE (on or about) | SEC FILING |
|-------|--------------------|------------|
| SEVEN | May 15, 2000 | SEC Form 10-Q for the First Quarter Ended March 31, 2000 that falsely reported net revenue in the amount of $214,456,000, when in fact the net revenue was only $186,194,000. |
| EIGHT | July 21, 2000 | SEC Form S-8 incorporating SEC Form 10-K for the Fiscal Year End December 31, 1999 and SEC Form 10-Q for the First Quarter Ended March 31, 2000 that falsely reported net revenue in the amount of $214,456,000, when in fact the net revenue was only $186,194,000. |
| NINE | August 14, 2000 | SEC Form 10-Q for the Second Quarter Ended June 30, 2000 that falsely reported net revenue in the amount of $233,672,000, net income in the amount of $11,399,000, and earnings per share of $.08, when in fact the net revenue was only $172,320,000, and there was actually a net loss and a net loss per share. |
| TEN | November 14, 2000 | SEC Form 10-Q for the Third Quarter Ended September 30, 2000 that falsely reported net revenue in the amount of $238,737,000, net income in the amount of $4,079,000, and earnings per share of $.03, when in fact the net revenue was only $176,726,000, and there was actually a net loss and a net loss per share. |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United State Code, Section 2.

//

INDICTMENT                                    19

1

COUNTS ELEVEN TO NINETEEN: 15 U.S.C. §§ 78m(b)(2) and 78ff;
17 C.F.R. § 240.13b2-2; 18 U.S.C. § 2 (False Statement to Auditors and Aiding and Abetting)

2

43.  Paragraphs 1 through 34, 37 and 40 are realleged as if fully set forth here.

3

44.  On or about the following dates, in the Northern District of California and elsewhere,

4

the defendant

5

PRABHAT GOYAL

6

did knowingly and willfully make and cause to be made materially false and misleading

7

statements to Network Associates' auditor PWC in connection with the audit and examination of

8

Network Associates' financial statements for the fiscal years and fiscal quarters indicated, and the

9

preparation of documents and reports required to be filed with the SEC, and did knowingly and

10

willfully omit to state material facts necessary in order to make statements made – in light of the

11

circumstances under which such statements were made – not misleading.

| COUNT | DATE (on or about) | Document |
|---|---|---|
| ELEVEN | April 15, 1999 | Management Representation Letter to PriceWaterhouseCoopers for fiscal year ended December 31, 1998, including false, misleading and incomplete explanations and disclosures regarding the manner in which business is conducted with channel distributors, completeness of documentation provided, accuracy of financial statements and accounting records including reserves, and distributors rights to return product. |
| TWELVE | May 12, 1999 | Management Representation Letter to PriceWaterhouseCoopers for first quarter ended March 31, 1999, including false, misleading and incomplete explanations and disclosures regarding the manner in which business is conducted with channel distributors, explanations for missing first quarter revenue/earning results and expectations regarding expected product returns, completeness of documentation provided, accuracy of financial statements and accounting records including reserves, and distributors rights to return product. |

INDICTMENT                                    20

| COUNT | DATE (on or about) | Document |
|-------|--------------------|----------| 
| THIRTEEN | August 12, 1999 | Management Representation Letter to PriceWaterhouseCoopers for second quarter ended June 30, 1999, reiterating in substance representations contained in May 12, 1999 representation letter including false, incomplete and misleading explanations for missing first quarter revenue/earning results and expectations regarding expected product returns. |
| FOURTEEN | October 21, 1999 | Management Representation Letter to PriceWaterhouseCoopers for third quarter ended September 30, 1999, reiterating in substance representations contained in May 12, 1999 and August 12, 1999 representation letters. |
| FIFTEEN | January 24, 2000 | Management Representation Letter to PriceWaterhouseCoopers for fiscal year ended December 31, 1999, including false, misleading and incomplete explanations and disclosures regarding the manner in which business is conducted with channel distributors, completeness of documentation provided, accuracy of financial statements and accounting records including reserves and so-called round-trip transactions. |
| SIXTEEN | March 30, 2000 | Management Representation Letter to PriceWaterhouseCoopers for fiscal year ended December 31, 1999, reiterating representations contained in January 24, 2000 representation letter. |
| SEVENTEEN | May 8, 2000 | Management Representation Letter to PriceWaterhouseCoopers for first quarter ended March 31, 2000, reiterating representations contained in January 24, 2000 representation letter. |
| EIGHTEEN | August 14, 2000 | Management Representation Letter to PriceWaterhouseCoopers for second quarter ended June 30, 2000, reiterating representations contained in January 24, 2000 and May 8, 2000 representation letters. |

21

| COUNT | DATE (on or about) | Document |
|-------|---------------------|----------|
| NINETEEN | November 14, 2000 | Management Representation Letter to PriceWaterhouseCoopers for third quarter ended September 30, 2000, reiterating representations contained in January 24, 2000 and including false, misleading and incomplete explanations and disclosures regarding the manner in which business is conducted with channel distributers, completeness of documentation provided and accuracy of financial statements and accounting records including reserves. |

All in violation of Title 15, United States Code, Sections 78m(b)(2) and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Section 2.

//

INDICTMENT                                      22

1  COUNT TWENTY: 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff, and
      17 C.F.R. § 240.13b2-1; 18 U.S.C. § 2 (False Books and Records and Aiding and Abetting)

2

3      45. Paragraphs 1 through 34, 37 and 40 are realleged as if fully set forth here.

       46. Beginning in or about January 1999 and continuing through December 2000, in the
4
   Northern District of California and elsewhere, the defendant
5
                                     PRABHAT GOYAL
6
   did knowingly and wilfully, directly and indirectly, falsify and cause to be falsified, books,
7
   records, and accounts of Network Associates and did thereby cause revenue, net income (loss),
8
   earnings (loss) per share and expenses to be materially misstated.
9
       All in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and
10
   78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1; and Title 18, United States
11
   Code, Section 2.
12

13
   DATED:                                        A TRUE BILL.
14
   June 10, 2004
15                                               FOREPERSON

16
   KEVIN V. RYAN
17 United States Attorney

18

19 ROSS W. NADEL
   Chief, Criminal Division
20

21
   Approved as to form:
22                       JEFFREY L. BORNSTEIN
                         Assistant United States Attorney
23

24

25

26

27

28

   INDICTMENT                              23