1  SCOTT N. SCHOOLS (SCBN 9990)
   United States Attorney
2
   W. DOUGLAS SPRAGUE (CSBN 202121)
3  Acting Chief, Criminal Division

4  ELISE BECKER (NYSBN 2540730)
   BRIAN J. STRETCH (CSBN 163973)
5  Assistant United States Attorneys

6     450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102
7     Telephone: (415) 436-7200
      Telecopy: (415) 436-7234
8     Elise.Becker@usdoj.gov
      Brian.Stretch@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11                 UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                 SAN FRANCISCO DIVISION

14

15 UNITED STATES OF AMERICA,          )     No. CR-04-0201-MJJ
                                      )
16        Plaintiff,                  )     GOVERNMENT'S CONSOLIDATED
                                      )     OPPOSITION TO DEFENDANT'S RULE
17    v.                              )     29 MOTION FOR A JUDGMENT OF
                                      )     ACQUITTAL AND RULE 33 MOTION
18 PRABHAT GOYAL,                     )     FOR A NEW TRIAL
                                      )
19        Defendant.                  )
                                      )
20 _____   )

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A. Legal standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      1.     Motion for a judgement of acquittal pursuant to Fed. R. Crim. P. 29 . . . . . . . . . 1

      2.     Motion for a new trial pursuant to Fed. R. Crim. P. 33 . . . . . . . . . . . . . . . . . . . 2

   B. Evidence at trial proved beyond a reasonable doubt that the defendant committed
      securities fraud and lied to NAI's auditors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      1.     Background information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      2.     The scheme to defraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      3.     The charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   C. The defendant's Rule 29 motion should be denied . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      1.     The evidence at trial established securities fraud violations beyond a reasonable
           doubt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      2.     PwC was not provided the buy-in letters, nor the terms and conditions of the IM
           buy-in deals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      3.     The evidence established beyond a reasonable doubt that the defendant acted
           willfully, knowingly, and with intent to defraud . . . . . . . . . . . . . . . . . . . . . . 10

   D. The defendant's Rule 33 motion should be denied . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      1.     The evidence was sufficient to support the verdicts . . . . . . . . . . . . . . . . . . . . 11

      2.     The lay witness testimony did not violate Fed. R. Evid. 701 . . . . . . . . . . . . . . . 12

      3.     The government's closing argument was not improper . . . . . . . . . . . . . . . . . . . 13

      4.     The recklessness instruction was legally correct. . . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*SEC v. Guenther*, 395 F.Supp 2d 835 (D. Neb. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*SEC v. Todd*, 2007 WL 1574756 (S.D. Cal. May 30, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Alarcon-Simi*, 300 F.3d 1172 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Alston*, 974 F.2d 1206 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Andrino-Carillo*, 63 F.3d 922 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Atcheson*, 94 F.3d 1237 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Conley*, 249 F.3d 38 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Ebbers,* 458 F.3d 110 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Figueroa-Paz*, 468 F.2d 1055 (9th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Goodlow*, 910 F.Supp 476 (D.S.D 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3

*United States v. Martin*, 228 F.3d 1 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Necoechea*, 986 F.2d 1273 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Nelson*, 419 F.2d 1237 (9th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Olbres*, 61 F.3d 967 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Reyes-Alvarado*, 963 F.2d 1184 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Rigas*, 2007 WL 1518619 (2d Cir. May 24, 2007) . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Rojas*, 554 F.2d 938 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Rush*, 749 F.2d 1369 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Sinclair*, 438 F.2d 50 (5th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Tarallo*, 380 F.3d 1174 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Turner*, 2007 WL 1367597 (W.D. Wash. May 8, 2007) . . . . . . . . . . . . . . . . . 13

*Wright v. West*, 505 U.S. 277 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**INTRODUCTION**

The defendant's motion for acquittal, and in the alternative, for a new trial should be denied because the government proved beyond a reasonable doubt that the defendant committed securities fraud by causing Network Associates, Inc. (NAI) to file materially false and misleading financial statements with the Securities and Exchange Commission (SEC) in the years 1998, 1999 and 2000.  The government also proved beyond a reasonable doubt that the defendant lied to NAI's auditors by repeatedly making the materially false representation in management representation letters that NAI had disclosed all the terms of its transactions with its largest distributor, Ingram Micro (IM), when, in fact, quarter-end buy-in letters, in addition to oral concessions, had not been disclosed to PriceWaterhouseCoopers (PwC) throughout the years 1998, 1999 and 2000.

As set forth below, the evidence, when viewed under the Rule 29 and Rule 33 standards, supports the jury's verdicts of guilty on all counts.  Accordingly, both motions should be denied.

**ARGUMENT**

A. Legal standards

    1. Motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29

The test for determining whether to grant a Rule 29 motion "is whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in light favorable to the Government." *United States v. Figueroa-Paz*, 468 F.2d 1055, 1058 (9th Cir. 1972); *United States v. Nelson*, 419 F.2d 1237, 1242 (9th Cir. 1969).  In ruling on a Rule 29 motion, a district court must bear in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts."  *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977) (internal quotation marks omitted).  All reasonable inferences are drawn in favor of the government, *United States v. Andrino-Carillo*, 63 F.3d 922, 924 (9th Cir. 1995), and the evidence is reviewed in the light most favorable to the government to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002)

1   (internal quotation marks omitted) (emphasis in original).  Furthermore, "[t]he court must credit

2   both direct and circumstantial evidence, without evaluating or speculating on the weight the jury

3   has given different pieces of evidence, and without making its own judgments as to credibility."

4   *United States v. Martin*, 228 F.3d 1, 10 (1ˢᵗ Cir. 2000).  "Moreover, circumstantial evidence and

5   inferences drawn from it may be sufficient to sustain a conviction."  *United States v. Reyes-*

6   *Alvarado*, 963 F.2d 1184, 1188 (9ᵗʰ Cir. 1992).

7        Ultimately, "[i]f the evidence presented, taken in the light most flattering to the prosecution,

8   together with all reasonable inferences favorable to it, permits a rational jury to find each

9   essential element of the crime charged beyond a reasonable doubt, then the evidence is legally

10  sufficient."  *United States v. Olbres*, 61 F.3d 967, 970 (1ˢᵗ Cir. 1995).  Indeed, proof beyond a

11  reasonable doubt does not mean proof beyond all doubt; accordingly, "the prosecution need not

12  affirmatively 'rule out every hypothesis except that of guilt.'"  *Wright v. West*, 505 U.S. 277, 296

13  (1992) (plurality opinion) (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)).

14       As set forth below, the evidence presented during the government's case in chief clearly

15  established each and every element of the crimes charged and the jury's verdicts should not be

16  set aside.

17       2.   <u>Motion for a new trial pursuant to Fed. R. Crim. P. 33</u>

18  "A district court's power to grant a motion for a new trial is much broader than its power to

19  grant a motion for judgment of acquittal."  *United States v. Alston*, 974 F.2d 1206, 1211 (9ᵗʰ Cir.

20  1992).  "The court is not obliged to view the evidence in the light most favorable to the verdict,

21  and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses."

22  *United States v. Kellington*, 217 F.3d 1084, 1097 (9ᵗʰ Cir. 2000).  However, the court must strike

23  a balance between weighing the evidence and credibility of the witnesses and not "wholly

24  usurp[ing]" the role of the jury.  *United States v. Ferguson*, 246 F.3d 129, 133 (2nd Cir. 2001)

25  (quoting *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000).

26       A motion for a new trial "should be granted only in exceptional cases in which the evidence

27  preponderates heavily against the verdict."  *United States v. Rush*, 749 F.2d 1369, 1371 (9ᵗʰ Cir.

28  1984) (internal quotation marks omitted).  Thus, "[i]f the court concludes that, despite the

1   abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently

2   heavily against the verdict that a serious miscarriage of justice may have occurred, it may set

3   aside the verdict, grant a new trial, and submit the issues for determination by another jury."

4   *Kellington*, 217 F.2d at 1097 (internal quotation marks omitted).  "The remedy of a new trial

5   must be used sparingly, and only where a miscarriage of justice would otherwise result."  *United*

6   *States v. Conley*, 249 F.3d 38, 45 (1st Cir. 2001).  A new trial motion "is addressed to the

7   discretion of the court, which should be exercised with caution, and the power to grant a new

8   trial ... should be invoked only in exceptional cases."  *United States v. Sinclair*, 438 F.2d 50, 51

9   n.1 (5th Cir. 1971) (internal quotation marks omitted).

10       Here, the evidence presented at trial supports this Court's finding that the jury's verdicts were

11   far from a serious miscarriage of justice and, therefore, a new trial should not be granted.

12   B.   Evidence at trial proved beyond a reasonable doubt that the defendant committed securities
     fraud and lied to NAI's auditors

13       1.   Background information

14       Between 1998 and 2000, NAI was a publicly-traded company that developed and sold

15   software products relating to network security and network management.  GX601-03, 1998 10K.

16   NAI's stock was registered with the SEC and its shares were traded on the NASDAQ national

17   market. GX682, Stipulation No. 2.  As a public company, NAI was required to comply with SEC

18   regulations which required it to file quarterly (10-Q) and annual (10-K) reports, and Forms S-8

19   with the SEC.  GX683, Stipulation No. 3.  Unlike the quarterly reports, the 10-Ks included

20   audited financial statements conducted by the company's outside auditors, PwC.  GX601-003,

21   1998 10-K. S*ee also* VI Tr. 834:16-21 (Stavers),  XIII Tr. 1510:10-17 (Lucas).

22       During this same time period, the defendant was the Chief Financial Officer (CFO) of NAI.

23   William Larson was the Chief Executive Officer (CEO).  Between 1998 and in or about July

24   1999, Evan Collins was controller of NAI.  Between May 1998 and September 2000, Chris

25   Peterson was Director of Distribution for North America and then Vice-President of Distribution

26   Sales at NAI.  Between January, 1998 and April, 2000, Ricardo "Tony" Mendoza was Senior

27   Manager of Finance and Operations, Director of Finance and Operations, and then Senior

1   Director of Finance and Operations at NAI.  Between 1998 and the second quarter of 2000, Dale

2   Cline was Director of Business Development, Vice-President North America Channel Sales, and

3   ultimately Vice-President of World Wide Channel at NAI.

4       2.   The scheme to defraud

5       From 1998 through 2000, the defendant and others set financial goals for the company (VII

6   Tr. 1038:2-5 (Borrmann), X Tr.1372:22-1373:3 (Cline)), which it communicated both internally

7   and to the investing public, in part, by means of analyst calls in which the defendant participated

8   (VI Tr. 735:18-736:18 (Powers); VII Tr. 1028:1-6 (Borrmann)), and press releases (VII Tr. 1027:

9   7-16 (Borrmann)).  These goals were set in contemplation of analyst and market estimates.  VI

10  Tr. 790:7-17 (Denend).  In order to meet the revenue goals, for each fiscal quarter from 1998

11  through 2000 with the exception of the second quarter of 1999 and the fourth quarter of 2000,

12  NAI entered into large quarter-end transactions with the company's largest domestic distributor,

13  IM.  IX Tr. 1226:16-19 (Collins); VII Tr. 1037:14-21 (Borrmann);  VI Tr. 844:21-23 (Stavers);

14  VII Tr. 955:8-12 (Peterson).  NAI's failure to meet the projected revenue goals would have

15  caused a drop in the value of NAI's stock.  VI Tr. 796: 9-23 (Denend); VI Tr.733:9-19 (Powers).

16      Consistent with its obligations as a public company, NAI regularly filed Forms 10-K, 10-Q,

17  and S-8 with the SEC.  In those reports, NAI represented to the investing public that it recorded

18  revenue in compliance with Generally Accepted Accounting Principles (GAAP) on a sell-in

19  basis. VI Tr. 786:4-8 (Denend);  VI Tr. 733:20-734:2 (Powers).  In order for NAI to record

20  revenue on this basis, the following elements of its sales to IM had to be satisfied under

21  Statement of Position 97-2 GX685 (SOP 97-2):

22          1. Persuasive evidence of an arrangement exists;

23          2. Delivery has occurred;

24          3. The vendor's fee is fixed or determinable; and

25          4. Collectibility is probable.

26  In addition, Financial Accounting Standard 48 GX686 (FAS 48) required the following elements

27  to be met before revenue could be recorded at the time of sale:

28

1. The price is substantially fixed or determinable;

2. The buyer has paid or is obligated to pay, payment is not contingent on resale of the product;

3. The buyer's obligation would not be changed in the event of damage, theft, or destruction of the product;

4. The buyer has economic substance apart from that provided by the seller;

5. The seller does not have significant obligations for future performance to directly bring about the resale of the product; and

6. The amount of future returns can be reasonably estimated.

VIII Tr. 1134:20-1135:6 (Winters). NAI's failure to meet any one element of SOP 97-2 or FAS 48 defeated its ability to recognize revenue at the time of sale. VIII Tr. 1136:15-1137:18, 1138:22-24 (Winters). *See also*, VIII Tr. 1543:25-1544:1; 1544:19-1545:1 (Lucas).

In order to track the company's revenue performance throughout a fiscal quarter, the defendant met regularly with Borrmann. VII Tr. 1029:10-19 (Borrmann). Using the Four-Corner model as a forecasting tool, the defendant and Borrman discussed the amount of the revenue shortfall as it related to the quarterly target. VIII Tr. 1066:25-1067:15 (Borrmann) The buy-in deals with IM were critical to the company's ability to meet its quarterly revenue targets. VII Tr. 1037:3-21 (Borrmann); IX Tr. 1226:16-19 (Collins). To achieve that goal, the defendant set the amount of the quarterly buy-in deal with IM, he authorized the parameters upon which the deal could be negotiated, and he alone ultimately approved the final terms and conditions of every buy-in deal with IM. X Tr. 1372:22-1373:7 (Cline).

In general, the buy-in letters committed NAI to provide IM with the following sales conditions that were not included in the distribution agreement between the two companies:

1. sell-through rebates for subsequent quarters;

2. rights of return beyond the terms of the distribution agreement;

3. guaranteed margins; and

4. excess inventory fees.

GX 5; 26; 75; 78; 138; 140; 291; 292; 293; 326; 327; 375; 424; 506; 526; 527; 631; and 632.

1   In addition to the written quarter end buy-in deals, NAI entered into oral side agreements

2   with IM that the defendant approved.  IX Tr. 1322:14-1323:11 (Mendoza).  The oral agreements

3   related to rights of return and sell-through commitments to IM.  GX27.  The sell-through

4   commitments were satisfied through NetTools, NAI's wholly owned subsidiary that had no

5   employees or independent existence apart from NAI.  VIII Tr. 1215:9-12; 1216:18-1217:7;

6   1294:13-17 (Collins).  In substance, NAI "pushed" part of its direct sales business to NetTools,

7   NetTools purchased the NAI product from IM, and IM shipped the product to the end user. VIII

8   Tr. 1213:6-8; 1214:9-1215:12 (Collins); VII Tr. 967:7-969:4 (Peterson); GX651.  NAI was solely

9   responsible for bringing about IM's sales through NetTools.  IV Tr. 524:15-526:14 (Ward).

10   Under SOP 97-2 and FAS 48, some of the terms in the quarter-end buy-in letters with IM

11   precluded NAI from recognizing revenue from the buy-in deals in the quarters in which the deals

12   were entered into.  Specifically, the commitment to give sell through rebates for subsequent

13   quarters defeated the fixed or determinable component of SOP 97-2 and FAS 48 (VIII

14   Tr.1145:17-1146:4 (Winters)); the commitment to a guaranteed margin on the sale of the product

15   would generally preclude revenue recognition at the time of sale (VIII Tr.1146:11-1147:5

16   (Winters); VIII Tr. 862:14-863:1 (Stavers)); the right of return beyond the terms of the

17   distribution agreement and sell through commitments are both consistent with the seller's

18   significant obligation for future performance to directly bring about the resale of the product

19   (VIII Tr. 864:22-865:9 (Stavers); VIII Tr.1151:6-18 (Winters)); and paying excess inventory fees

20   is inconsistent with FAS 48 (VIII Tr.1157:2-12 (Winters); s*ee also* IX Tr.1230:1-14 (Collins)).

21   The terms and conditions of NAI's quarter-end written buy-in deals with IM, in addition to its

22   oral agreements with IM, and its use of NetTools were material to the auditors and were relevant

23   to the determination of the proper accounting of the underlying transactions.  VIII Tr.1144:21-

24   1145:9 (Winters); 1149:16-20 (Winters); VI Tr. 860:7-8 (Stavers); VI Tr. 865:10-22 (Stavers).

25   The terms and conditions were material because PwC required NAI, and specifically the

26   defendant, to affirm that NAI had provided PwC all materials relevant to its transactions so that

27   PwC could competently perform its review and/or audit of NAI's financial statements.  *Id.*

28   Specifically, PwC required NAI to make the following affirmative statements in its management

representation letters: that there were no material transactions or agreements or accounts that had not been properly recorded in its accounting records; that the company had the ability to estimate returns; and that the company had fully disclosed all sales terms, including rights of return, or price adjustments and all warranty provisions. VIII Tr.1153:7-1154:2 (Winters).

3.   The charges

The jury was asked to determine the defendant's guilt on 15 counts, including one count of securities fraud, seven counts of securities fraud relating specifically to false SEC filings, and seven counts of lying to the auditors.

In order to convict the defendant of securities fraud, the jury was required to find that the defendant knowingly and willfully engaged in a scheme to defraud any person in connection with the purchase or sale of NAI's shares, or made or caused to be made false and misleading statements to the SEC.  (Jury Instruction No. 23).

In order to convict the defendant of causing false SEC forms to be filed, the jury was required to find that the defendant knowingly and willfully made or caused NAI to make materially false and misleading statements in its Forms10-Q, 10-K and S-8. (Jury Instruction No. 25).

In order to convict the defendant of lying to the auditors, the jury was required to find that the defendant made or caused to be made untrue statements of material fact or failed to disclose material facts that would have made statements to the auditors not misleading.  (Jury Instruction No. 27).  These counts related to management representation letters that the defendant signed as CFO and provided to PwC in connection with their audits and reviews of NAI's financial records.

C.   The defendant's Rule 29 motion should be denied

1.   The evidence at trial established securities fraud violations beyond a reasonable doubt

While expert witness testimony may be required in a civil SEC securities fraud enforcement action, there is no similar requirement in a criminal case.  Indeed, criminal securities fraud convictions have been upheld notwithstanding the government's decisions not to present expert testimony.  Most recently, the Second Circuit upheld the securities fraud convictions of Timothy and John Rigas in connection with the Adelphia scandal, holding that "[t]he government was not

1   required to present expert witness testimony about GAAP's requirements because these

2   requirements are not essential to the securities fraud alleged here." *United States v. Rigas*, 2007

3   WL 1518619, *8 (2d Cir. May 24, 2007). This is true because "[i]t has been the long-held view

4   in this [Second] Circuit that GAAP neither establishes nor shields guilt in a securities fraud

5   case." *Id.* Similarly, in *United States v. Ebbers*, the Second Circuit found that

6   > even where improper accounting is alleged, the statute requires proof only
7   > of intentionally misleading statements that are material, *i.e.* designed to
    > affect the price of a security. 15 USC 78ff. If the government proves that
8   > a defendant was responsible for financial reports that intentionally and
    > materially misled investors, the statute is satisfied. The government is not
    > required in addition to prevail in a battle of expert witnesses over the
9   > application of individual GAAP rules.

10  458 F.3d 110, 125-126 (2d Cir. 2006).

11      Unlike the testimony presented by the SEC in *SEC v. Guenther*, 395 F. Supp.2d 835 (D. Neb.

12  2005), Winters testified that NAI recognized revenue on a sell-in basis which required NAI's

13  sales with IM to comply with all the elements of SOP 97-2 and FAS 48, that specific conditions

14  of the IM buy-in letters were inconsistent with specific requirements under GAAP rules, and that

15  these conditions would have affected PwC's audits and reviews of NAI's financial records

16  because they would have an impact on NAI's revenue recognition abilities on the related

17  transactions. VIII Tr. 1123:25-1187:4 (Winters). This is far more specific than the testimony

18  offered by Dr. Bazley in *Guenther*. *Id* at 847.

19      In addition, the evidence at trial proved the qualitative and quantitative materiality of the

20  quarter-end buy-in deals with IM on NAI's Forms 10-K and 10-Q beyond a reasonable doubt.

21  First, NAI recognized revenue based on purchase orders. IX Tr. 1293:8-1294:6 (Collins).

22  Second, if one were to compare the total dollar values of the purchase orders associated with the

23  quarter-end buy-in letters, the result would be that they represented approximately 24% of the

24  total revenue for NAI during 1998, 1999 and 2000. *See* GX 5; 26; 75; 78; 138; 140; 291; 292;

25  293; 326; 327; 375; 424; 506; 526; 527; DX 1144; GX681 Stipulation No. 1. On a quarterly

26  basis, the quarter-end buy-ins represented between approximately 7% to 40% of NAI's total

27  revenue. *Id.* Clearly, the jury here did not need expert testimony to explain to them the

28  materiality of the buy-in deals on NAI's financials.

The defendant's reliance on *SEC v. Todd*, 2007 WL 1574756 (S.D. Cal. May 30, 2007) on this point is misplaced.  In *Todd*, the court found that SEC expert testimony regarding the impact of failing to record revenue from a transaction that the expert opined could have been partially recorded was insufficient evidence of materiality.  *Id* at *4.  Here, however, the accountants responsible for ensuring proper revenue recognition testified that terms in the buy-ins were inconsistent with recognizing any revenue at the time of sale which is consistent with the charges against the defendant.

Lastly, the evidence at trial established beyond a reasonable doubt that NAI used NetTools to directly bring about the resale of its product from IM, as set forth at section B above.  *See also* VIII Tr. 1212:7-1213:8 (Collins); IX Tr. 1226:2-3; 1294:13-17 (Collins).  While the defendant persists in his argument that PwC knew about NetTools (Def. Mot. at 11), PwC's audit partner was clear that he was never aware that NetTools was used to satisfy sell-through commitments. VI Tr. 864:5-865:9 (Stavers).  Winters was also equally clear that the use of NetTools for that purpose would specifically preclude revenue recognition on a sell-in basis under FAS 48.  VIII Tr. 1150:8 - 1151:18 (Winters).  Furthermore, the record is clear that NAI committed sell-through amounts to IM and that it met those commitments each and every time.  V Tr. 624:21-625:10 (Ward).  The defendant's reliance on *Todd* is again equally misplaced because there is no evidence here that the defendant either brought the NetTools sell-through commitments to PwC's attention, or that PwC engaged in an analysis of these commitments on a deal-by-deal basis, unlike the evidence in *Todd*.  2007 WL 1574756 at *11 (evidence that defendant discussed transaction in question with auditor, then followed up with auditor, and note in PwC workpaper relating to review of transaction was insufficient evidence of scienter).

2.  PwC was not provided the buy-in letters, nor the terms and conditions of the IM buy-in deals

In essence, the defendant argues that his management representation letters to PwC were accurate and not materially misleading because PwC had access to all the terms and conditions of the quarter-end buy-in deals with IM.  However, the testimony from PwC- the audit partner and the audit manager on NAI's account- was clear that PwC had never seen the buy-in letters (VI Tr.

863:23-864:4 (Stavers)), nor had it seen any debit memos, with or without referenced or attached buy-in letters. VIII Tr. 1184:10-17 (Winters).

As is clear from the purchase orders and invoices in evidence, none of the unusual terms of the buy-in letters are referenced in the records that were reviewed by PwC.  However, all the quarter-end purchase orders and invoices and ensuing debit memos were issued as a direct result of the buy-in letters.  IV Tr. 497:20-498:10; V Tr. 557:16-19; 558:8-18 (Ward).  Furthermore, the record is clear that this was specifically the type of information PwC required to adequately perform their audit and review.  *See* VIII Tr. 1142:24-1143:11 (Winters); IX Tr. 1228:18-21 (Collins) .

As set forth in the management representation letters, the defendant had an affirmative responsibility to make sure that all the terms and conditions of its sales were disclosed to PwC. His reliance on the possibility that PwC would see records relating to some of the conditions of NAI's largest quarterly transactions in order to avoid responsibility on these counts is completely absurd.

> 3. <u>The evidence established beyond a reasonable doubt that the defendant acted willfully, knowingly, and with intent to defraud</u>

As set forth at section B above and throughout the trial transcripts, in substance, the government proved beyond a reasonable doubt that:

> a. The defendant regularly discussed with Borrmann NAI's revenue, its targeted revenue goals, and the size of a quarter-end buy-in with IM necessary to meet the revenue expectations;
>
> b. Revenue directly resulting from the buy-in deals were reported in NAI's financial statements and Borrmann knew that these statements were materially false;
>
> c. The defendant discussed and approved all buy-in terms, and ordered certain concessions not to be put in writing;
>
> d. The defendant met regularly with PwC to discuss and review NAI's revenue recognition yet he never discussed any of the buy-in terms, nor did he ever raise any of the revenue recognition issues with them;
>
> e. The defendant misled PwC about the true use of NetTools;
>
> f. The defendant set out guidance about not using side agreements, yet Collins believed that the defendant did not want him to disclose the buy-in

letters to PwC;

g.   The defendant was outraged by Peterson's memo questioning the appropriateness of NAI's extremely high payments to IM, telling Cline that Peterson put him a difficult position by sending him the memo and letters, and that "I couldn't know about these letters" (X Tr. 1375:15);

h.   The defendant repeatedly assured PwC, the Board of Directors and the public that NAI's accounting complied with GAAP, which meant that its recognition of revenue on the quarter-end buy-in deals were in compliance with SOP 97-2 and FAS 48.

This evidence, taken in the light most favorable to the government, and with all reasonable inferences drawn in favor of the government, supports the jury's finding that the defendant knowingly engaged in an ongoing course of conduct that caused NAI's financial statements to be false and misleading.

D.   The defendant's Rule 33 motion should be denied

1.   The evidence was sufficient to support the verdicts

As set forth above at section B, the government submits that the evidence presented in its direct case was sufficient to establish the defendant's guilt on all counts beyond a reasonable doubt.  Notwithstanding effective cross-examination of the government's witnesses, in addition to an amended jury instruction on the credibility of witnesses (Jury Instruction No. 13), and an instruction on the testimony of cooperating witnesses (Jury Instruction No. 15), the jury's verdicts make clear that they believed the government's case and discredited the defendant's, which necessarily means that they did not believe the defendant's experts, and Mr. Leonard in particular.  While the defendant argues that his expert who had only three or four experiences auditing software companies (XIII Tr. 1629:2 (Leonard)) engaged in the most comprehensive review of the record of any witness called at trial (Def. R33 Memo at 7), Leonard's testimony was not quite so clear.  XIII Tr. 1633:1-6; 1672:5-18 (Leonard).  Yet, even though he had not reviewed all the records himself, his limited review was still sufficient to support some of the government's arguments, namely that PwC never saw any of the actual debit memos because all the debit memos in evidence are Bates stamped IM (see GX84; GX211; GX213; GX214; GX215; GX 291; GX 293; DX714; XIII Tr. 1634:2-21 (Leonard)) and NAI's accounting of the "November 1999 letters" was improper. XIII Tr. 1675:5-8 (Leonard).

In addition, the defendant offered evidence that, on occasion, he discussed accounting matters with PwC and others.  *See* DX25; DX62; DX645; DX933  This is in fact consistent with the government's argument that the defendant knew the applicable accounting rules and made a conscious decision not to discuss the transactions in question with PwC because of their obvious accounting consequences.

Based on the trial record and applying the legal standards by which this Court must review the defendant's motion for a new trial, the defendant has failed to demonstrate why this case is so exceptional as to warrant this Court's rejection of  the jury's assessments of the witnesses' credibility and to grant a new trial.

2.   The lay witness testimony did not violate Fed. R. Evid. 701

The defendant argues that Evan Collins offered inadmissible expert opinion as to the defendant's state of mind.  Def R33 Memo at 16.  However, the defendant failed to object to this testimony.  IX Tr. 1230:8-9 (Collins).  Therefore, the court must determine whether or not Collins's statement that he didn't think that the defendant wanted him to provide the buy-in letters to PwC affected a substantial right of the defendant. *United States v. Goodlow*, 910 F.Supp. 476, 477 (D.S.D. 1995).  The record here does not support such a finding because the defendant had, and exercised his right to cross-examine Collins on this point.  Accordingly, the defendant does not argue, and indeed there is no evidence that admission of this testimony caused a miscarriage of justice. *Id.*

The defendant also argues that Winters offered inadmissible expert opinions when he testified whether certain terms in the IM buy-in letters "would have been significant to him." This argument is patently absurd given the charges against the defendant.  As set forth above, the defendant was charged with lying to the auditors, and the government was required to prove that the defendant knowingly withheld information relating to the IM buy-in deals that was material to PwC in performing its audits and reviews.  Materiality was further defined as information that would significantly alter the total mix of information available to the auditors.  Jury Instruction No. 27.  The most direct evidence that the government could present to the jury on this point was the testimony of the auditor that the withheld information would have affected his judgment, and

1    why. *See United States v. Turner*, 2007 WL 1367597, *2 (W.D. Wash. May 8, 2007) (witnesses

2    with specialized knowledge such as accountants can testify as percipient witnesses without being

3    designated as experts notwithstanding their expertise).

4        3.   The government's closing argument was not improper

5        The defendant complains that the government made factual misstatements in its closing

6    argument and improperly shifted the burden of proof to the defendant.  Def. R33 Memo at 20-24.

7    The accusations are baseless and should be rejected out of hand.

8        It is settled law that "prosecutors must have reasonable latitude to fashion closing arguments,

9    and thus can argue reasonable inferences based on the evidence. . ."  *United States v. Necoechea*,

10   986 F.2d 1273, 1276 (9th Cir. 1993); *see also United States v. Atcheson*, 94 F.3d 1237, 1244 (9th

11   Cir. 1996) ("It is not misconduct for the prosecutor to argue reasonable inferences based on the

12   record.") (citation omitted).

13       In addition, the Court instructed the jury that "arguments and statements by lawyers" and

14   "what [the lawyers] have said in closing arguments" are not evidence.  Jury Instruction No. 6.  In

15   addition, the government reminded the jury in closing argument that "[I]t's your recollection of

16   the testimony that controls; not anything that I say, not anything that the defense has said."

17       Here, the defendant asserts that the government misstated Winters' testimony regarding the

18   validity of PwC's audit opinion, Lucas' testimony regarding NAI's ability to estimate returns at

19   the beginning of its channel sales relationship with IM, and Leonard's testimony that NAI's use

20   of NetTools amounted to warehousing product.  Notably, this is not a case in which counsel

21   argued facts not in evidence, vouched for witnesses, or commented on a defendant's silence.

22   Rather, in each instance, the government offered nothing more than reasonable inferences and

23   conclusions drawn from the testimony at trial.  *Necoechea*, 986 F.2d at 1276.  While the

24   defendant may draw different inferences from the testimony offered by these witnesses, there is

25   simply nothing improper about the arguments themselves.

26       The defendant also complains that the government overplayed his involvement in the buy-in

27   deals by stating that "Mr. Goyal is cc'ed, carbon copied on those buy-ins" and as a result he was

28   "elbow-deep" and the "mastermind" of the buy-in transactions, when the evidence established

that he was copied on just two of the buy-in letters.  Def. R33 Memo at 23.  Given the repeated

testimony throughout the trial of the defendant's direct and integral involvement in the buy-in

transactions (*see* discussion in Section B above) the government would be hard pressed to

overstate his role in those matters.  And contrary to the defendant's truncated excerpts set forth in

his memorandum, the government's argument on the point of the defendant's involvement in the

buy-in transactions was far more detailed and developed, and fully supported by the evidence:

> So what's happening is the buy-ins. The final decisions that are made are trickling
> back up the chain. So the number comes from Mr. Goyal at the top, goes through
> Dale Cline, Chris Peterson, Brigid Van Randall, Scott Sanor, then it comes back
> up. And as you'll see on the buy-in letters, Mr. Goyal is cc'd, carbon copied on
> those buy-ins eventually when it is the final record of what the conditions are of
> the deal.  He is the one who sets the number.  He's the one who tells them to
> initiate this deal.  He's the one who sets the parameters.  He's the one who
> approves them.  He is elbow-deep in these transactions.  Nothing is happening
> here without his knowledge, without his consent. And he's the mastermind of it.
> It's not somebody else coming up with the idea, "Oh, you know, we should do a
> buy-in this quarter. I think this is a good number I just made it up."  He is making
> the conscious decision to do these things. Again, nothing at that company with
> these buy-ins was happening without his knowledge.

XVI Tr. 1853.

   Nor did the government improperly argue, as suggested by the defendant, from defense

exhibits admitted at trial.  Rather, the government sought to impeach Leonard's testimony on the

sufficiency of NAI's reserves through the defendant's own exhibits.  Leonard testified about

NAI's practice in setting reserves as follows:

> The way NAI recognizes revenue, and really all companies have to -- in a general
> way, have to recognize revenue this way, is they -- they bill on invoices. So they
> bill a customer -- a customer buys something, a customer issues a PO to them,
> they fulfill the PO, they ship the product, and then they invoice the customer.
> They send him a bill. And they would recognize that bill as revenue. And then, in
> connection with that revenue, they would also need to recognize any kind of --
> they need to recognize the reserve that would be associated with any kind of
> discount, warranty or return kind of activity that they would expect to have. So in
> the end they are trying to recognize, of that invoice, how much of that invoice are
> they actually going to recover in cash going forward.

XIII Tr. 1577.  In addition, Leonard opined that the company properly calculated reserves by

stating:

> I didn't see anything in all of the work papers that I looked at that would suggest
> that the reserves were not appropriate. But I didn't do an audit, I wasn't there at the
> time, so there are things that I might have liked to do that I just don't know.  But
> there's -- there's nothing in any work papers or documents I've seen that would

1    suggest that -- that there was a problem with the reserves.

2    XIII Tr. 1651.

3        In its opening summation the government pointed out that a defense exhibit, DX832,

4    established that Ingram took approximately $111 million in debits against approximately $136

5    million in invoices (invoiced over two quarters) in Q2 of 2000, for which, according to

6    Leonard's testimony, sufficient reserves were required at the end of Q1 of 2000 (XIII Tr. 1583).

7    The defendant introduced exhibit DX1158 to establish that the company set aside worldwide

8    reserves totaling $47,162,000 for the first quarter of 2000.  The government compared and

9    contrasted the two defense exhibits in closing to challenge Leonard's credibility regarding the

10   sufficiency of NAI's reserves.  Not only did the defendant not object to the government's

11   argument on this point, he had an opportunity to rebut it during his closing argument if he felt

12   that it was in any way misleading.

13       Finally, the defendant argues that the government imposed a burden on him to prove

14   affirmatively that PwC had seen the actual buy-in letters.  Def. R33 Memo at 23.  That simply is

15   not the case.  The defendant was charged in counts 13 through 19 with making false statements

16   to the auditors.  The false statements were contained in the management representation letters

17   that he signed on a regular basis in which he stated, among other things, that the company had

18   fully disclosed all sale terms, including rights of return, or price adjustments and all warranty

19   provisions.  Most of the sale terms with IM were memorialized in the buy-in letters.  The

20   government's theory of liability was that the defendant, whose responsibility it was as CFO to

21   comply with the statements he made in the management representation letters, failed to advise

22   PwC of the all the terms and conditions of the transactions with IM.   Neither the buy-in letters

23   nor the terms of the sales were provided to PwC.

24       The government's proof on that point came from the PwC auditors themselves, Stavers and

25   Winters, who each said that they neither saw the buy-in letters nor were otherwise made aware of

26   all the terms and conditions of the Ingram transactions.  The government's references in closing

27   argument to the lack of evidence establishing that the buy-in letters were shown to PwC clearly

28   pertained to the defendant's obligations as CFO of the company, having signed the management

1    representation letters, to insure that the auditors received all the terms and conditions of the

2    transactions.  At no time did the government suggest that the defendant  had an obligation to

3    produced at trial any evidence whatsoever.   Accordingly, the burden of proof was not shifted to

4    the defendant.

5        4.   <u>The recklessness instruction was legally correct</u>

6        Ninth Circuit precedence is clear, "[T]o prove a defendant guilty of securities fraud . . . based

7    on making a false or misleading representation, the government must prove beyond a reasonable

8    doubt that the defendant knew the representation was false or was made with reckless

9    indifference to its truth or falsity."  *United States v. Tarallo*, 380 F.3d 1174, 1188 (9th Cir. 2004).

10        The jury was charged in this case on counts three through five and seven through ten (false

11    statements in SEC filings) that the government must prove beyond a reasonable doubt, among

12    other things, that the defendant acted "willfully, knowingly, and with the intent to defraud." *See*

13    Jury Instruction No. 25  The jury was further charged that it may find that the defendant acted

14    willfully if it found beyond a reasonable doubt that the defendant "made or caused to be made a

15    false statement, which he then knew to be untrue," or if it found that the defendant "intentionally

16    acted with reckless indifference as to the truth or falsity of such statement."  *Id.*

17        The defendant complains that the "reckless" definition in *Tarallo* applies only to the first

18    clause of Section 78ff(a) (which criminalizes willful violations of the securities fraud statutes)

19    and not to the second clause of 78ff(a) (which criminalizes willful and knowing violations).  Def.

20    R33 Memo at 24-25.  Although *Tarallo* itself does not parse that distinction, the argument is

21    nevertheless mooted by the fact that this Court instructed the jury that in order to find the

22    defendant guilty in counts three through five and seven through ten, it had to find not only that

23    the defendant acted willfully (which included reckless conduct) but also that he acted knowingly

24    (and with intent to defraud).  The jury, therefore, could not have convicted the defendant without

25    finding a knowing violation of the statute.  The jury charge was consistent with the language of

26    the indictment and in accord with Ninth Circuit precedence.  Accordingly, the Court did not err

27    in giving the reckless definition as it pertained to defendant's willful conduct.

28

**CONCLUSION**

For all the reasons set forth above, the defendant's motion to set aside the jury's verdicts and for a new trial should be denied.

DATED: July 19, 2007                    Respectfully submitted,

                                        SCOTT N. SCHOOLS
                                        United States Attorney


                                                /s/
                                        _____
                                        ELISE BECKER
                                        BRIAN J. STRETCH
                                        Assistant United States Attorneys