WILMER CUTLER PICKERING
  HALE AND DORR LLP
Stephen A. Jonas (stephen.jonas@wilmerhale.com)
Mark C. Fleming (mark.fleming@wilmerhale.com)
Jennifer L. Carpenter (jennifer.carpenter@wilmerhale.com)
Christopher R. Noyes (christopher.noyes@wilmerhale.com)
Kim Friday (kim.friday@wilmerhale.com)
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Ronald C. Machen (ronald.machen@wilmerhale.com)
Matthew Holmwood (matthew.holmwood@wilmerhale.com)
Charles Beene (charles.beene@wilmerhale.com)
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363

Attorneys for Defendant

PRABHAT K. GOYAL

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>v.<br><br>**PRABHAT GOYAL,**<br><br>**Defendant.** | **Case No. CR-04-0201-MJJ**<br><br>**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29**<br><br>**Hearing Date: August 9, 2007**<br>**Hearing Time: 9:30 a.m.**<br>**Location: Courtroom 11, 19th Floor**<br>**Before: Honorable Martin J. Jenkins** |

*Left margin, vertical text:* **Wilmer Cutler Pickering Hale and Dorr LLP**
**60 State Street**
**Boston, MA  02109**

1

# TABLE OF CONTENTS

2

3
Page

4
TABLE OF AUTHORITIES .................................................................................................. ii

5
INTRODUCTION .............................................................................................................. 1

6
ARGUMENT .................................................................................................................... 2

7
I.      THE GOVERNMENT DID NOT PROVE A GAAP VIOLATION ...................................... 2

8
        A.      The Government Did Not Show That NAI's Reserves Could Not Be
                Reasonably Estimated ................................................................................. 2

9
        B.      Neither Mr. Stavers Nor Mr. Winters Testified To A GAAP Violation ...................... 2

10
        C.      The Government Cannot Prove A GAAP Violation Without Expert Testimony ........ 6

11
        D.      The Government Did Not Prove The Amount Of Revenue That It Contends
                Was Improperly Recognized, Let Alone Demonstrate That Such An Amount
12
                Was Material To NAI's Financial Statements ............................................. 7

13
II.     THE GOVERNMENT DID NOT PROVE THAT MR. GOYAL
        MISREPRESENTED THAT ALL MATERIAL DEAL TERMS HAD BEEN
14
        DISCLOSED TO PWC ................................................................................................. 10

15
III.    NO REASONABLE JUROR COULD HAVE FOUND THAT MR. GOYAL ACTED
        WILLFULLY, KNOWINGLY, AND WITH AN INTENT TO DEFRAUD ...................... 11
16

17
IV.     THE GOVERNMENT'S EVIDENCE OF CRIMINAL INTENT IS FAR WEAKER
        THAN IN OTHER CASES WHERE JUDGMENT OF ACQUITTAL WAS
18
        GRANTED ................................................................................................................. 14

19
CONCLUSION ................................................................................................................. 15

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

*Chiarella v. United States*, 445 U.S. 222 (1980) ............................................................9

*In re Alpharma Inc. Securities Litigation,* 372 F.3d 137 (3d Cir. 2004) .....................13

*In re Coca-Cola Enterprises, Inc. Securities Litigation*, No. 06-CV-0275, 2007 WL 472943 (N.D. Ga. Feb. 7, 2007) ........................................................................................8

*In re Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006 (9th Cir. 2006) .............8

*In re Winship*, 397 U.S. 358 (1970) ...............................................................................6

*In re Wyse Technology Securities Litigation*, No. C-89-1819, 1990 WL 169149 (N.D. Cal. Sept. 13, 1990) ......................................................................................................8

*SEC v. Guenthner*, 395 F. Supp. 2d 835 (D. Neb. 2005) ...............................................6

*SEC v. Todd*, No. 03CV2230, 2007 WL 1574756 (S.D. Cal. May 30, 2007) .................10, 12, 13

*Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995) .......................................4

*United States v. Brown*, 459 F.3d 509 (5th Cir. 2006)...........................................12, 15

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005) ...........................................12, 15

*United States v. Chance*, 306 F.3d 356 (6th Cir. 2002) ................................................4

*United States v. Corral-Gastelum*, 240 F.3d 1181 (9th Cir. 2001)...............................12

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) ..................................................6

*United States v. Esquivel-Ortega*, 484 F.3d 1221 (9th Cir. 2007) ...............................12

*United States v. Hernandez*, 301 F.3d 886 (8th Cir. 2002)...........................................15

*United States v. Hernandez-Bautista*, 293 F.3d 845 (5th Cir. 2002) ...........................12

*United States v. Recognition Equipment Inc.*, 725 F. Supp. 587 (D.D.C. 1989) ...........12

*United States v. Rigas*, __ F.3d ___, 2007 WL 1518619 (2d Cir. May 24, 2007).....................6, 9

*United States v. Turner*, No. CR05-355C, 2007 WL 1367597 (W.D. Wash. May 8, 2007) ..........6

*United States v. Vasquez-Chan*, 978 F.2d 546 (9th Cir. 1992)......................................12

*Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956 (N.D. Cal. 2005) .......................13

## STATUTES

Fed. R. Crim. P. 29(b)....................................................................................................2

Fed. R. Evid. 702 ...........................................................................................................7

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### **INTRODUCTION**

Although judgments of acquittal are the exception, this is that exceptional case.  Nothing in the Government's Opposition suggests otherwise.

The securities fraud counts (Two through Ten) required proof that NAI's use of sell-in accounting in its financial statements violated GAAP, and that Mr. Goyal had *actual knowledge* of such a GAAP violation.[1]  The Government does not deny that proof of a GAAP violation required a showing that NAI could not reasonably estimate or reserve for estimated future obligations—and yet, it points to no evidence whatsoever on this issue.  Neither of the Government's PwC witnesses testified that NAI's use of sell-in accounting was actually inappropriate.  Indeed, the Government's failure to proffer an expert opinion on that issue made it impossible for the jury to find a GAAP violation without speculating.  The Government also tacitly acknowledges its failure to prove how much revenue NAI actually recognized on the Ingram quarter-end transactions or what effect (if any) a different accounting method for those transactions would have had on NAI's reported revenue.

As for the false statements to auditors counts (Thirteen through Nineteen), the Government does not dispute that the accused management representation letters were all signed and sent after Evan Collins' departure from NAI, thus rendering his claim that he concealed buy-in letters even further removed from the allegations against Mr. Goyal.  Nor does the Government deny that the debit memos (which PwC reviewed) referred to *and attached* buy-in letters for NAI-Ingram quarter-end deals, even during Mr. Collins' tenure at NAI.

Finally, the Government offered *no* testimony that anyone ever told Mr. Goyal (or he them) that NAI's use of sell-in accounting violated GAAP or that NAI's disclosure to PwC was incomplete.  The Government's short list of evidence proffered to show criminal intent is equally consistent with innocence, and indeed provides far weaker evidence of *mens rea* than in other cases where convictions were reversed.  The Rule 29 motion should be granted and Mr. Goyal acquitted on all counts.

---

[1] The Government agrees that, notwithstanding its insistence that the Court give a "recklessness" instruction for the "false filings" counts, the convictions cannot be sustained without a finding that Mr. Goyal acted "knowingly (and with intent to defraud)."  Opp. 16.

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL**

## ARGUMENT

**I.    THE GOVERNMENT DID NOT PROVE A GAAP VIOLATION**

    **A.    The Government Did Not Show That NAI's Reserves Could Not Be Reasonably Estimated**

        The Government accused Mr. Goyal of securities fraud and false filings on the theory that various terms of NAI's deals with Ingram violated FAS 48, thus making NAI's use of sell-in accounting improper under GAAP.  But as the Government conceded in its summation—and does not dispute in its Opposition—such deal terms did not defeat sell-in accounting provided NAI could estimate future amounts due and maintain adequate reserves.  XVI Tr. 1843:12-13 (Government's summation: a right of return is "fine if you could reasonably estimate what those returns were going to be"); *id.* 1844:15-18 (same for guaranteed rebate on future sales); *id.* 1845:14-20 (same for "unlimited right of return"); *id.* 1866:1-4 (same for price concessions).

        As the Opening Memorandum pointed out (at 7-8), the Government offered no testimony suggesting that NAI's reserves were not (let alone could not be) reasonably estimated.  Critically, the Government does not dispute this gap in its evidence.  The only document the Government cites regarding NAI's reserves is DX1158 (*see* Opp. 15:7), which was introduced during the defense case and therefore has no bearing on this motion.  *See* Fed. R. Crim. P. 29(b).  The Government's silence is perhaps understandable given PwC's repeated examination of NAI's reserves and conclusion that they were appropriate.  *See, e.g.*, VII Tr. 929:10-13 (PwC found debit memo reserve reasonable for 1999); *id.* 931:10-19 (PwC found return reserves adequate for every quarter from 1998-2000); DX121 (PwC approves 1998 return reserve); DX287 (PwC tests and approves both reserves for 1999); DX364-37 (PwC 1999 Report to Management approving reserves and management estimates); DX498 (PwC approves both reserves for second quarter of 2000).  The lack of evidence suggesting that NAI could not reasonably estimate or reserve for distributor concessions vitiates any argument that NAI's use of sell-in accounting violated GAAP.

    **B.    Neither Mr. Stavers Nor Mr. Winters Testified To A GAAP Violation**

        Even if the Government could simply ignore the issue of reserves—which it cannot—its attempt to prove a GAAP violation failed for another reason:  its PwC witnesses did not testify that

the terms of NAI's quarter-end deals with Ingram actually rendered the use of sell-in accounting improper under GAAP. The most Robert Stavers and Hans Winters could offer was that certain deal terms "would raise questions" leading to further inquiry. VI Tr. 861:18-20 (Stavers); *see also* VII Tr. 940:3-4 (stating that information in buy-in letters "*would possibly* change the opinion that we issued" (emphasis added)); VIII Tr. 1142:9-12 (Winters) ("I would at least *raise the question if* [the 90 day pay freight provision] means that Network Associates *might have* agreed here with Ingram that they would be allowed to return all the product back . . . ." (emphasis added)).

The Government argues, however, that Messrs. Stavers and Winters "testified that terms in the buy-ins were inconsistent with recognizing any revenue at the time of sale." Opp. 9:5-6. As an initial matter, they could not have testified to such a conclusion. The Government never proffered them as experts, nor did the Court permit them to offer opinions regarding NAI's GAAP compliance. More importantly, however, the Government's assertion is a serious overreading of the record, facilitated by the Government's failure to place the witnesses' actual words before the Court.

*First*, the Government cites Mr. Winters for the proposition that "sell-through rebates for subsequent quarters defeated the fixed or determinable component of SOP 97-2 and FAS 48." Opp. 6:12-13 (citing VIII Tr. 1145:17-1146:4). The witness did not so testify:

> A      Well, *the question that you could ask yourself is if*, at the date of sale, your price at that point is fixed and determinable.
>
> I think that the problem that I have with it, in terms of making sure that you can book your revenue, is that you don't know what pricing adjustment the distributor is going to give or what sales the distributor is going to do in the next quarter.
>
> And therefore you don't know what the actual rebate is, what you are going to pay, and therefore *you might -- you could question if your price is fixed at that point*, at sale.

VIII Tr. 1145:20-1146:4 (emphasis added). Mr. Winters' cautious statements that "you could ask yourself" and "you could question" whether the price was fixed are far cries from the Government's assertion that the rebates "defeated" a fixed or determinable price.

*Second*, the Government argues that "a guaranteed margin on the sale of the product would generally preclude" sell-in accounting. Opp. 6:14-16. Again, the cited passages do not permit a reasonable juror to reach this conclusion:

A      Well, guaranteed 3 percent margin, from my professional judgment, *would question if you would -- could consider* that you have here a sales transaction, at all.

The fact is that if -- if Network Associates guarantee a fixed margin to its reseller, the reseller does not have any risk on its inventory.  And *therefore you could wonder, yourself, if* this is a true sale or that it *should be considered as a consignment*.  (VIII Tr. 1146:20-1147:2 (Winters) (emphasis added)).

*        *        *

A      Well, again, these are terms and conditions that relate to an order to Ingram Micro for the third quarter of 1998.  And *it is important for us to know all of the terms and conditions surrounding a particular sales transaction*.

With respect to these terms and conditions, No. 2, guaranteed 3 percent margin on all license sales to resellers, would indicate that the company was going to -- would not be able to determine the price at which it sold the product to Ingram Micro, because if Ingram Micro didn't have -- didn't recognize a certain gross margin on its sales, then we would reimburse them for it.

*So I would need to know what this term was, why it was in there, and what's behind it.*  (VI Tr. 862:14-863:1 (Stavers) (emphasis added)).

Both witnesses thus viewed the guaranteed margin term as, at most, a basis for further inquiry, not as a term that "would generally preclude" sell-in accounting.  Opp. 6:15.

*Third*, the Government asserts that "paying excess inventory fees is inconsistent with FAS 48."  Opp. 6:19-20.  Once again, Mr. Winters says something quite different in the cited passage:

A      Well, the two -- first of all, these are significant payments to a distributor. Now, the size is not the most important factor, but *I get a bit troubled by the description* that says 20 million to cover inventory financing cost, and *that [is] where I would like to get a better understanding of from the company*.

VIII Tr. 1157:2-12 (emphasis added).

Application of GAAP, especially to matters such as the proper use of sell-in accounting, involves "continuous judgments and estimates."  *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995).  To move from raising "questions" or a preference for "a better understanding" to the Government's desired conclusion of a GAAP violation would require not only the *answers* the Company would have given to the auditors' questions, but also expert consideration of the implications those answers would have had for sell-in accounting of particular transactions—neither of which the Government offered, much less proved.  To conclude from the PwC's witnesses' "questions" that a GAAP violation occurred is speculation, not reasonable inference.  *Cf. United States v. Chance*, 306 F.3d 356, 381-382 (6th Cir. 2002) (reversing conviction where the government

1   "exaggerate[d] if not distort[ed]" the record; "the government cannot meet its burden of proof by

2   imparting a general impression that the defendant's conduct meets one of the elements of the

3   offense").[2]

4       *Finally*, the Government argues, in reference to NetTools, that certain "sell-through

5   commitments" were "consistent with the seller's significant obligation for future performance to

6   directly bring about the resale of the product." Opp. 6:16-19. Once again, no witness testified that

7   NAI's use of NetTools to give direct business to distributors amounted to a "significant obligation"

8   or defeated sell-in accounting.[3] In fact, NetTools was only in place from June 1998 to the second

9   quarter of 1999, and (according to Mr. Collins) resulted in between $5 and $10 million in quarterly

10  Ingram sales—a small fraction of NAI's overall Ingram business. VIII Tr. 1212:13-19, 1215:15-23.

11  Most importantly, PwC's workpapers show that PwC was fully aware of NetTools and its uses. *E.g.*,

12  DX 287-1 (PwC workpaper discussing reserves for "Net Tools Business"); DX287-3 (PwC

13  workpaper discussing reserves for "Net Tools Sales"); DX881-46 (PwC flowchart explaining

14  NetTools); IX Tr. 1295:17-18 (Collins) (PwC advised NAI on the accounting for NetTools).

15      PwC also *specifically recognized that NetTools was used to fulfill "commitments" to*

16  *distributors and to "push" business to them.* DX881-48 (October 1998 PWC audit document

17  regarding NetTools stating that "Orders are fulfilled through various distribution channels with

18  whom NAI has certain dollar commitments."); DX122-24 ("NAI either has MMI fulfill orders for

19  them, or they 'push' order fulfillment to designated distributors."). Notwithstanding this awareness,

20  PwC consistently found that NAI's use of sell-in accounting met all FAS 48 factors including the

21  absence of "significant obligations." *E.g.,* DX282-3.[4]

22      [2] The Government also cites Evan Collins's assertion that "some of the terms … in certain
23  agreements" would "ruin the revenue recognition." IX Tr. 1230:10-14 (cited at Opp. 6:20). This
    conclusory assertion—which Mr. Collins never explained—does not prove a GAAP violation either.
        [3] Mr. Stavers said NAI might have "materially assist[ed]" distributor sales (VI Tr. 864:17-
24  865:9), but never equated that with a "significant obligation." Mr. Winters hazarded only that a
25  significant obligation would exist "*if indeed* Network Associates had a commitment to make sure
    that the distributor was being able to sell its product, and to the extent that it was not able to sell its
26  product, that it would make sure that the sales were there." VIII Tr. 1150:17-22 (emphasis added).
        [4] The Government carefully asserts that the "audit partner" (Stavers) did not remember
27  NetTools being used to increase channel sales (Opp. 9:11-12), though he did know that it allowed
    distributors to fulfill NAI's direct sales (VI Tr. 864:2-16). Regardless of Mr. Stavers' memory in
28  2007, PwC's workpapers showed its understanding and repeated review of the NetTools business.

1   The Government's suggestions that Mr. Goyal should have personally advised PwC of

2   NetTools or encouraged PwC to "engage[] in an analysis" of NetTools "on a deal-by-deal basis"

3   (Opp. 9:18-19) are difficult to fathom.  Mr. Goyal was not indicted (nor could he have been indicted)

4   for failure to ensure that PwC did its job.  Rather, the Government was required to show that Mr.

5   Goyal approved financial statements that he knew violated GAAP.  Whether Mr. Goyal encouraged

6   PwC to analyze the NetTools transactions on a "deal-by-deal basis" has no bearing on that issue.[5]

7   ### C.   The Government Cannot Prove A GAAP Violation Without Expert Testimony

8   The Government accepts that expert testimony is required in civil cases and enforcement

9   actions alleging GAAP violations.  *See SEC v. Guenthner*, 395 F. Supp. 2d 835, 847 (D. Neb. 2005).

10   The Government appears to believe, however, that it may secure a criminal conviction on less

11   evidence than is required of a civil securities plaintiff seeking money damages.  Opp. 7:24-25.  The

12   Supreme Court rejected this view as "amounting to a lack of fundamental fairness."  *In re Winship*,

13   397 U.S. 358, 363-364 (1970) (citation omitted).  And the Government cites a criminal case where it

14   itself acknowledged that "expert testimony is required" in order to "discuss particular practices or

15   accounting treatments … in terms of GAAP."  *United States v. Turner*, No. CR05-355C, 2007 WL

16   1367597, at *2 (W.D. Wash. May 8, 2007) (cited at Opp. 13:1).

17   The Government may forgo expert GAAP testimony if it contends that securities fraud was

18   committed independently of any GAAP violation.  Thus, in *United States v. Rigas*, __ F.3d __, 2007

19   WL 1518619 (2d Cir. May 24, 2007), no GAAP expert was needed because the prosecution's theory

20   was that the defendants misled investors "[e]ven if [they] complied with GAAP."  *Id.* at *8; *see also*

21   *id.* (noting that GAAP is "not essential to the securities fraud alleged here").  *United States v.*

22   *Ebbers*, 458 F.3d 110, 125-126 (2d Cir. 2006), holds similarly that the Government may sometimes

23   prove securities fraud without proving a GAAP violation.  In this case, however—unlike *Rigas* and

24   *Ebbers*—the Government never suggested that NAI's financial statements were false or misleading

25   in any way other than noncompliance with GAAP (specifically FAS 48 and SOP 97-2).  The

26

27   [5] Moreover, there was no evidence that Mr. Goyal could even have ascertained what type of "analysis" PwC was conducting at the time.  The Government never attempted to show that Mr.

28   Goyal had access to PwC's workpapers.

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL**

Government limited its fraud case to GAAP (*see* XVI Tr. 1834:21-25, 1836:7-8) and, notably, does not argue in its Opposition that Mr. Goyal could be convicted absent proof of a GAAP violation. *Rigas* and *Ebbers* are accordingly distinguishable, and *Guenthner*'s holding that a court may not find noncompliance with GAAP without expert guidance is directly on point.

The Government suggests (Opp. 8:11-18) that Mr. Winters provided the expert testimony that was lacking in *Guenthner*. But Mr. Winters did little more than introduce the FAS 48 and SOP 97-2 standards and then raise "questions" as to whether NAI's practices met those standards. While he at one point improperly offered a conclusion as to the viability of PwC's audit opinion (*see* Rule 33 Opening Memorandum at 18:4-19:12)—he did not purport to offer any opinions regarding GAAP compliance based on any factual investigation or the application of a reliable methodology. Nor could he have done so, since the Government repeatedly refused to proffer him as an expert under Rule 16. VI Tr. 714:1-4; VIII Tr. 1188:15-18. As a result, the Government did not disclose any "opinion" that Mr. Winters might offer, and the defense had no opportunity to cross-examine him on the grounds that his "opinion" was not based on "sufficient facts or data" and not "the product of reliable principles and methods" that were applied "reliably" to the facts of this case. Fed. R. Evid. 702. The defense accordingly objected when Mr. Winters attempted to offer GAAP opinions and—again, except as discussed in the Rule 33 briefing—the Court properly forbade him from opining on GAAP compliance. As the Court observed, "[o]ne needs a much more rigorous foundational predicate for him to put that opinion in," because it was not shown that "he's actually done the work, to perform the computations that would establish a basis to render an opinion as to the audit today." VIII Tr. 1187:17-22. For the Government now to suggest that Mr. Winters in fact offered sixty-four pages of expert opinion, including determinations that the buy-in terms "were inconsistent with specific requirements under GAAP" (Opp. 8:11-17 (citing VIII Tr. 1123:25-1187:4)) is to rewrite history to Mr. Goyal's extreme prejudice.

**D.    The Government Did Not Prove The Amount Of Revenue That It Contends Was Improperly Recognized, Let Alone Demonstrate That Such An Amount Was Material To NAI's Financial Statements**

In addition to being required to prove that NAI's revenue recognition violated GAAP, the Government had to prove that such an accounting violation was material. It did not. At trial, the

1    Government based its materiality case on a stipulation, which (as the Government does not now

2    deny) was irrelevant due to failure to establish the stipulation's factual predicate.  Opening

3    Memorandum ("Rule 29 Br.") 8-10.  The Government was left with no evidence, testimonial or

4    otherwise, as to the actual *amount* of revenue that was (but allegedly should not have been)

5    recognized on the Ingram transactions.  As courts have held even in civil cases, it is impossible to

6    determine whether a revenue-recognition error was material without proof of the amount of revenue

7    alleged to have been improperly recognized.  *See, e.g., In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d

8    1006, 1019 (9th Cir. 2006) (a securities plaintiff asserting improper revenue recognition must set

9    forth "the approximate amount by which revenues and earnings were overstated"); *In re Coca-Cola*

10    *Enters., Inc. Sec. Litig.*, No. 06-CV-0275, 2007 WL 472943, at *4-*6 (N.D. Ga. Feb. 7, 2007)

11    (dismissing complaint alleging improper revenue recognition on distributor sales because plaintiffs

12    did not offer "any indication of the amount of revenue that was improperly recognized," making it

13    impossible to tell whether "the amount of sales or revenue improperly recognized [was] material in

14    relation to the size of the company's operations"); *In re Wyse Tech. Sec. Litig.*, No. C-89-1819

15    WHO, 1990 WL 169149, at *2 (N.D. Cal. Sept. 13, 1990) (dismissing false statements count for

16    failure to allege "the approximate amount of the overstatement in the financial statements in order to

17    demonstrate that the alleged misconduct had a material impact on each statement").

18        The Government does not deny that it offered no evidence of the amount of revenue

19    recognized on the Ingram buy-in transactions.  Instead, the Government suggests that the jury could

20    have engaged in two calculations of its own: (1) "compar[ing] the total dollar values of the purchase

21    orders associated with the quarter-end buy-in letters" and concluding that the quarter-end deals made

22    up "approximately 24%" of revenue for the three-year indictment period; and (2) calculating that the

23    buy-in letters represented "approximately 7% to 40%" of revenue for any given quarter.  Opp. 8:22-

24    27.  This suggestion fails for two reasons.

25        *First,* and most importantly, the amount of *revenue* recognized from a transaction is not the

26    same as the gross price on a buy-in letter, a purchase order, or even an invoice, but rather is the

27    invoice amount *less deductions* of related liabilities that are paid in the same quarter and reserves

28    made for estimated future liabilities, including product returns.  DX298-59 (1999 Form 10-K)

1  ("Revenue generated from products sold through traditional channels where the right of return exists

2  is reduced by reserves for estimated sales returns."); GX601-54 (same language in 1998 10-K);

3  DX516-64 (2000 Form 10-K) ("[R]evenue is not recognized with respect to those shipments which

4  management estimates will be returned."); DX498-1 (PwC workpaper stating that outstanding debit

5  memos on the Company's books and in transit "are fully reserved as an offset against revenue");

6  DX120-1 (PwC workpaper stating as an example that NAI might only recognize 80% of an invoice

7  price as revenue and reserve 20%); VI Tr. 814:10-11 (Denend) ("The bookings in any given quarter

8  tend to be higher than the actual revenue.").  No witness ever testified that NAI's recognized revenue

9  on any particular transaction was the same as the amount on a buy-in letter or a purchase order.

10  Indeed, the Government focused at trial on the fact that NAI offered large price concessions to

11  Ingram, which reduces the recognized revenue far below the gross purchase price.  To the extent the

12  Government simply added up the gross amounts on buy-in letters and purchase orders and divided

13  the total by the recognized revenue figure for the period, it did not compare apples to apples.

14      *Second*, the Government never placed its new materiality theory before the jury.  Even in its

15  Opposition, the Government does not specify what particular data or methodology it used to

16  calculate its figures; a string citation of 18 exhibits without elaboration (Opp. 8:24-25) does not

17  demonstrate how a reasonable juror could have reached the Government's numbers.  Although the

18  Government claims to derive its 24% figure from "purchase orders," the Government never

19  introduced any purchase orders.  Indeed, the only cited document containing purchase order amounts

20  is a chart admitted during the *defense* case (DX1144), on which the Government may not rely under

21  Rule 29(b).  The Government cannot defend the verdict on a theory not argued at trial.  *Chiarella v.*

22  *United States*, 445 U.S. 222, 235-36 (1980); *Rigas*, 2007 WL 1518619, at *17 n.29 ("[W]e will not

23  consider in the first instance arguments regarding materiality that were not presented to the jury.").

24      Given the Government's failure to provide specific materiality evidence, the jury may well

25  have been tempted to engage in the sort of speculative tallying to which the Government now

26  resorts.  *Cf.* XVII Tr. 1966:8-10 (jury request for a calculator).  But a criminal conviction cannot rest

27  on the unproven (and fundamentally incorrect) premise that an amount listed on a buy-in letter or a

28  purchase order is the same as the amount of revenue recognized for the several transactions that

comprised the quarter's buy-in deal.  Without such evidence, there was no way for the jury to

determine "whether [NAI's] financial statements … would have looked any different" had a

different accounting method been used.  *SEC v. Todd*, No. 03CV2230, 2007 WL 1574756, at *4

(S.D. Cal. May 30, 2007).  The Government's materiality evidence was insufficient, and its *post hoc*

attempt to craft a new materiality argument should be rejected.[6]

## II.    THE GOVERNMENT DID NOT PROVE THAT MR. GOYAL MISREPRESENTED THAT ALL MATERIAL DEAL TERMS HAD BEEN DISCLOSED TO PWC

At trial, the Government relied on Evan Collins' assertion that he deliberately concealed buy-

in letters from PwC as evidence that NAI did not disclose all material sales terms to PwC and,

therefore, that Mr. Goyal's management rep letters were knowingly false.  The Government's

Opposition does not dispute, however, that all the rep letters at issue were written and sent *after July

1999*, when Mr. Collins was no longer at NAI.  *See* Rule 29 Br. 21:5-15.  Thus Mr. Collins'

evidence cannot support an inference that the rep letters were inaccurate (or that Mr. Goyal knew

they were).

The Government accordingly rests on the PwC witnesses' testimony that, as far as they

recalled, PwC did not see buy-in letters.  Yet PwC did see the debit memos that Ingram sent to NAI,

which not only disclosed the very sales terms that the Government claims were withheld, but

actually referenced and *attached* buy-in letters—both before and after Mr. Collins left.  *See* Rule 29

Br. 21:21-22:11.  When asked about a debit memo that stated "See Attached Letter From Q1 Deal

No. 4," Mr. Winters confirmed that he "always instructed our staff to make sure that all relevant

information what has been referenced on the document[,] that we review that."  VIII Tr. 1184:18-

1186:7.  The only reasonable conclusion is that, through its review of debit memos, PwC had access

to buy-in letters and deal terms.  Tellingly, the Government does not deny that debit memo review

would have allowed PwC to review the buy-in deal terms and buy-in letters themselves.

---

[6] The Government contends that its PwC witnesses "testified that terms in the buy-ins were inconsistent with recognizing *any revenue at the time of sale*."  Opp. 9:5-7 (emphasis added).  No record citation accompanies this sweeping statement, which goes far beyond anything that Messrs. Winters or Stavers ever said.  Indeed, the Government does not dispute that the buy-in letter for Q2 2000 (GX424-1) did not contain any impugned terms.  *See* Rule 29 Br. 9:11-14.

1    The Government instead asserts that PwC had not "seen any debit memos, with or without

2    referenced or attached buy-in letters."  Opp. 10:1-2.  This is curious, since the Government stated in

3    its own closing argument that PwC "did have visibility into the debit memos."  XVI Tr. 1860:1-2.  It

4    is also a serious misstatement of the record, in that Messrs. Stavers and Winters both agreed that

5    PwC did review debit memos.  VI Tr. 872:8-14 (Stavers agreeing that PwC "had full access" to debit

6    memos and to any term that was "reflected on a debit memo"); VII Tr. 910:22-25 (Stavers

7    recognizing a debit memo form); *id.* 927:15-930:6 (Stavers agreeing that PwC audited debit memos

8    extensively); VIII Tr. 1164:4-16 (Winters admitting that "[m]y team reviewed debit memos" and

9    agreeing that "there was no limit ever put on their review of debit memos").  PwC's

10   contemporaneous workpapers confirm Stavers' and Winters' testimony and belie the Government's

11   contrary assertion.  *E.g.*, DX120 (PwC 1998 review of debit memos); DX287 (PwC 1999 review of

12   debit memos); DX309 (same); DX498 (PwC 2000 review of debit memos).[7]

13   Finally, the Government argues that Mr. Goyal had an "affirmative responsibility to make

14   sure" that sales terms were disclosed.  Opp. 10:10-14.  But Mr. Goyal directed NAI's Controller and

15   others to comply with PwC's requests, and Mr. Stavers said that he was comfortable with this

16   arrangement and did not expect Mr. Goyal to provide information himself.  VI Tr. 855:16-21, 869:6-

17   23.  The Indictment does not charge that Mr. Goyal failed "affirmative[ly]" to monitor that others

18   were carrying out their tasks as directed, but rather—as it must to allege a criminal offense—that Mr.

19   Goyal *knew* that not all sales terms had been disclosed, yet signed the rep letters nonetheless.  The

20   Government's evidence does not come close to proving that.

21   **III.    NO REASONABLE JUROR COULD HAVE FOUND THAT MR. GOYAL ACTED
         WILLFULLY, KNOWINGLY, AND WITH AN INTENT TO DEFRAUD**

22

23   The Government does not dispute that it was required to prove, beyond a reasonable doubt,

24   that Mr. Goyal had *actual knowledge* that the use of sell-in accounting materially violated GAAP

25
     _____

26   [7] The fact that neither Stavers nor Winters could recall seeing buy-in letters is hardly
     conclusive of PwC's access, since they admitted that they did not see all the documents that their
27   audit staff did.  *See, e.g.*, VI Tr. 863:17-20 (Stavers agreeing that he did not "meet[] with people at
     the company and go[] through documents"); VII Tr. 890:13-18 (Stavers agreeing that he did not see
28   all of the documents his staff saw and that he did not keep copies of everything he did see); VIII Tr.
     1163:16-19 (Winters estimating that "six or seven" PwC auditors worked on NAI's audits).

and that material sales terms were not disclosed.  The Government's unelaborated list of the propositions that it claims support a finding of criminal intent (Opp. 10-11) confirms how sparse its evidence is.  Taken individually or together, the Government's bullet points fall far short of a demonstration of willfulness, knowledge, and intent to defraud.

Because the Government's *mens rea* evidence is entirely circumstantial, it is critical to note that a conviction cannot stand where the evidence is "as probative of innocence as of guilt."  *United States v. Corral-Gastelum*, 240 F.3d 1181, 1185 (9th Cir. 2001) (reversing conviction).  As the Ninth Circuit recently reaffirmed, a defendant must be acquitted where the evidence "does not make the government's incriminating explanation any more likely than [the defendant's] innocent explanation."  *United States v. Esquivel-Ortega*, 484 F.3d 1221, 1227 (9th Cir. 2007).[8]

The Government's statement that Mr. Goyal "ordered certain concessions not to be put in writing" (Opp. 10:23) is a case in point.  Although Tony Mendoza testified that Mr. Goyal directed him not to memorialize certain concessions to Ingram, he did not suggest that this action had anything to do with accounting and, indeed, admitted that it was quite possible that Mr. Goyal simply wanted to avoid definitively agreeing to pay Ingram those concessions.  IX Tr. 1347:17-1348-14.  By Mr. Mendoza's own explanation, his testimony regarding Mr. Goyal's limited interaction with the buy-in letters is as probative (if not more probative) of innocence as of guilt.  And the assertion that Mr. Goyal "discussed and approved all buy-in terms" (Opp. 10:23)—apart from being a serious overstatement[9]—does not raise an inference that he believed that the deals were being accounted for in a manner contrary to GAAP.  *See United States v. Brown*, 459 F.3d 509, 524-

---

[8] *See also United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005) (Where the evidence gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, . . . a reasonable jury must necessarily entertain a reasonable doubt." (internal quotation marks omitted)); *United States v. Hernandez-Bautista*, 293 F.3d 845, 854 (5th Cir. 2002) (acquitting because "the evidence supports a theory of innocence at least as much as a theory of guilt and of the crime charged"); *United States v. Vasquez-Chan*, 978 F.2d 546, 551 (9th Cir. 1992) (reversing conviction where evidence "did not establish any reason to believe that an innocent explanation of that evidence was any less likely than the incriminating explanation advanced by the government"); *United States v. Recognition Equip. Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989) ("[T]his Court is not required to view the evidence through dirty window panes and assume that evidence which otherwise can be explained as equally innocent must be evidence of guilt.").

[9] Tony Mendoza stated that he only gave Mr. Goyal "summaries" of the deals, not full buy-in letters.  IX Tr. 1335:19-1336:6.

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL**

1    525 (5th Cir. 2006) (reversing conviction because defendant's awareness of a transaction did not

2    permit inference that he knew it would be accounted for improperly); *Todd*, 2007 WL 1574756, at

3    *14 (even where officer was presumed to have signed an agreement, that was not "evidence that he

4    was aware of the accounting implications").

5         The fact that Mr. Goyal met frequently with PwC, yet did not himself "raise any of the

6    revenue recognition issues with them" or "discuss[] any of the buy-in terms" (Opp. 10:24-25) is not

7    evidence of intent to defraud either.  These assertions are equally consistent with an honest belief

8    that PwC was reviewing all materials relevant to NAI's revenue recognition and that, if any matters

9    required discussion, PwC would raise them with him, or more likely with NAI's Controller, who was

10   ultimately responsible for NAI's accounting. IX Tr. 1230:19-22.  The Government's claim that Mr.

11   Goyal "misled PwC about the true use of NetTools" (Opp. 10:26)—made without any record cite—

12   is utterly unsupported.  The Government does not point to evidence of *any communication* between

13   Mr. Goyal and PwC with respect to NetTools, let alone one where Mr. Goyal "misled" anyone about

14   its use.  Indeed, PwC's workpapers show that it was not "misled" by anyone, least of all Mr. Goyal,

15   but rather was aware that NAI used NetTools to "push" direct business to distributors in response to

16   dollar commitments.  DX881-48; DX122-24; Rule 29 Br. 11:9-20.

17        Although Mr. Goyal discussed "revenue goals" with Eric Borrmann (Opp. 10:19-20), Mr.

18   Borrmann never suggested that they discussed revenue *recognition* or sell-in accounting.  "Nor is it a

19   reasonable inference that keeping track of the company's performance is evidence of intent to

20   defraud." *Todd*, 2007 WL 1574756, at *12.  While Mr. Borrmann said that NAI's financials had

21   unspecified "issues" (VII Tr. 1029:4-9), he never suggested that sell-in accounting was improper

22   under GAAP (a conclusion that, as a non-accountant, he could not have reached at any rate).

23   Contrary to the Government's claim, Mr. Borrmann never said that he "knew that [NAI's]

24   statements were materially false" (Opp. 10:21-22), nor did his testimony permit a rational conclusion

25   as to the "materiality" of any supposed error. Rule 29 Br. 5:16-6:6, 15:15-20.  And Mr. Borrmann's

26   state of mind is fundamentally not evidence of Mr. Goyal's, given the lack of any testimony that Mr.

27   Borrmann ever discussed his supposed "issues" with Mr. Goyal.  *See In re Alpharma Inc. Sec. Litig.*,

28   372 F.3d 137, 150 (3d Cir. 2004) (allegations that subordinate knew of accounting irregularities did

**Case No. CR-04-0201-MJJ**                        13        **DEFENDANT'S REPLY MEMORANDUM IN
                                                                SUPPORT OF RULE 29 MOTION FOR JUDGMENT
                                                                OF ACQUITTAL**

1    not permit inference of defendant's knowledge); *Zelman v. JDS Uniphase Corp.,* 376 F. Supp. 2d

2    956, 974 (N.D. Cal. 2005) ("The assertion that the practice was known to one of [defendant's]

3    subordinates does not support a strong inference that [defendant] also knew about the practice.").

4         Evan Collins' testimony that he "believed" that Mr. Goyal did not want him to disclose the

5    buy-ins (Opp. 10:28) is irrelevant twice over: first, because it was not based on anything Mr. Goyal

6    said or did, and second, because Mr. Collins' views are irrelevant to the time when the rep letters

7    were sent.  And as for Chris Peterson's memo, the Opening Memorandum noted (at 18:10-13)—and

8    the Government does not deny—that it was unconnected to sell-in accounting.  The Government

9    contends only that the memo "question[ed] the appropriateness of NAI's extremely high payments"

10   to Ingram.  Opp. 11:2-3.  Yet no Government witness explained how those payments were accounted

11   for, let alone suggested that they facilitated an improper use of sell-in accounting.  That Mr. Goyal

12   was angered by Peterson's acknowledged impertinence—a reaction that Peterson himself agreed was

13   "measured" (VII Tr. 996:19-23)—does not prove, or even suggest, accounting fraud.  Mr. Goyal

14   cannot be convicted for losing his temper.

15        The Government's other attempts to show knowledge of a GAAP violation in fact show the

16   opposite.  Mr. Goyal's provision of "guidance about not using side agreements" and "repeatedly

17   assur[ing]" various entities "that NAI's accounting complied with GAAP" (Opp. 10:27, 11:4-6) are

18   lawful and, indeed, laudable actions for a CFO to take.  That the Government attempts to spin them

19   as evidence of criminal intent demonstrates the weakness of its case.

20        Ultimately, the reason the Government was unable to demonstrate criminal intent is because

21   there was none.  Mr. Goyal believed that NAI's financial statements complied with GAAP and that

22   PwC's investigation was unobstructed.  The Government has not proven otherwise.

23   **IV.    THE GOVERNMENT'S EVIDENCE OF CRIMINAL INTENT IS FAR WEAKER**
         **THAN IN OTHER CASES WHERE JUDGMENT OF ACQUITTAL WAS GRANTED**
24

25        The Government's *mens rea* evidence falls far below the evidence in other cases where

26   courts have granted Rule 29 motions.  The Court should not hesitate to grant the same relief here.

27        The Second Circuit recently acquitted a defendant of insider trading due to a failure of *mens*

28   *rea* evidence, even though the Government had shown that he had tried to undo the stock sale after

the fact and told a witness that he had "made a stupid mistake" in connection with the sale.  *Cassese*, 428 F.3d at 101.  And in *Brown*, the Fifth Circuit held that the Government failed to prove that defendant Fuhs was aware of Enron's plan to account for a transaction improperly, even though Fuhs reviewed and forwarded a fax discussing the transaction that expressed concerns regarding the "'reputational risk' of 'aid[ing]/abet[ting] Enron income stmt. manipulation'"; the Fifth Circuit concluded that the fax "reveal[ed] nothing regarding Fuhs's understanding of Enron's intent to misrepresent the transaction"  459 F.3d at 514.  Although Fuhs also received numerous emails regarding the transaction, the Fifth Circuit also concluded that this evidence did not show knowledge of how the transaction would be accounted for.  *Id.* at 525.  As the Fifth Circuit noted, a court may not "begin with the assumption that [the defendant] is guilty" and then argue that "the documents can be read to support that assumption."  *Id.*; *see also United States v. Hernandez*, 301 F.3d 886, 890, 893 (8th Cir. 2002) (acquitting defendant of aiding and abetting drug crime due to insufficient proof of *mens rea*, despite evidence that defendant's roommate was a drug dealer, that roommate's car and cellular phone were registered in the defendant's name, that defendant wired money to Mexico on several occasions, and that police found a digital scale, plastic wrap, and over $14,000 in cash in defendant's home).

The Government did not point to a single meeting, conversation, or document indicating that Mr. Goyal expressed or heard any suggestion that NAI's accounting was incorrect or that its disclosure to PwC was lacking.  If a jury could not reasonably have convicted the defendants in *Cassese*, *Brown*, or *Hernandez*, then Mr. Goyal's conviction is even more unreasonable.

## <u>CONCLUSION</u>

The Court should enter judgment of acquittal on each and every count in the Indictment.

Dated: July 26, 2007

Respectfully submitted,

PRABHAT K. GOYAL

/s/  Stephen A. Jonas
WILMER CUTLER PICKERING
    HALE AND DORR LLP
Stephen A. Jonas
Ronald C. Machen (admitted *pro hac vice*)