WILMER CUTLER PICKERING
 HALE AND DORR LLP
Stephen A. Jonas (stephen.jonas@wilmerhale.com)
Mark C. Fleming (mark.fleming@wilmerhale.com)
Jennifer L. Carpenter (jennifer.carpenter@wilmerhale.com)
Christopher R. Noyes (christopher.noyes@wilmerhale.com)
Kim Friday (kim.friday@wilmerhale.com)
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Ronald C. Machen (ronald.machen@wilmerhale.com)
Matthew Holmwood (matthew.holmwood@wilmerhale.com)
Charles Beene (charles.beene@wilmerhale.com)
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363

Attorneys for Defendant

PRABHAT K. GOYAL

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>v.<br><br>**PRABHAT GOYAL,**<br><br>**Defendant.** | **Case No. CR-04-0201-MJJ**<br><br>**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL UNDER FED. R. CRIM. P. 33**<br><br>Hearing Date: August 9, 2007<br>Hearing Time: 9:30 a.m.<br>Location: Courtroom 11, 19th Floor<br>Before: Honorable Martin J. Jenkins |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT .............................................................................................................................. 1

I.  THE EXPERT TESTIMONY STRONGLY OUTWEIGHED THE GOVERNMENT'S EVIDENCE ON CRITICAL POINTS ................................................................................ 1

II. THE IMPROPER OPINION TESTIMONY BY LAY WITNESSES OBSCURED THE WEAKNESS OF THE GOVERNMENT'S CASE ............................................................. 8

III. THE ERRONEOUS "RECKLESSNESS" INSTRUCTION REQUIRES A NEW TRIAL ................................................................................................................................ 10

CONCLUSION ........................................................................................................................... 11

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Ghent v. Woodford*, 279 F.3d 1121 (9th Cir. 2002) ........................................................................9

*United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206 (9th Cir. 1992) ............................2

*United States v. Aguilar*, 80 F.3d 329 (9th Cir. 1996) ..................................................................10

*United States v. Kaplan*, __ F.3d. __, No. 05-5531, 2007 WL 1087270 (2d Cir. Apr. 11, 2007) ........................................................................................................................................9

*United States v. Moran*, __ F.3d __, Nos. 05-30215, 05-30226, 2007 WL 1952393 (9th Cir. July 6, 2007) ..............................................................................................................................10

*United States v. Tarallo*, 380 F.3d 1174 (9th Cir. 2004) ................................................................9

## STATUTES

Fed. R. Evid. 701 .............................................................................................................................8

## INTRODUCTION

There was no direct evidence of fraud in this record and the circumstantial evidence, if it existed at all, was overwhelmed by the testimony of the defense experts, crippling credibility issues for the Government's witnesses, and strong evidence of Mr. Goyal's good faith. This case is no different from one that could be presented against any CFO who is asked to make complex accounting judgments that are questioned nine years later, even though the very accountants who testify for the prosecution previously gave opinions supporting those judgments.

There are many reasons why the jury might have convicted Mr. Goyal—suspicion regarding the (legal) use of buy-ins to boost quarterly revenue and confusion regarding complex accounting issues to name two—but the weight of the evidence is not one of them. As the Rule 29 briefing shows, the Government failed to prove that Mr. Goyal committed the crimes charged even when all inferences are taken in its favor. When the record as a whole is viewed neutrally, the evidence favoring Mr. Goyal strongly outweighs that offered by the Government.

The Government's Opposition to the Rule 33 Motion is insubstantial. It makes no attempt to rehabilitate Messrs. Borrmann and Collins in light of their severe credibility problems or to explain why the minimal analysis offered by Messrs. Stavers and Winters should be credited. It does nothing to undermine the credibility of the defense experts and wholly ignores important aspects of their testimony. It offers no response to the evidence of Mr. Goyal's good faith. And it presents no analysis whatsoever (critical in a Rule 33 context) of the relative weight of the evidence suggesting guilt compared to the evidence favoring innocence. In the event that Mr. Goyal is not acquitted under Rule 29, the Court should set aside the verdict and order a new trial on all counts.

## ARGUMENT

### I. THE EXPERT TESTIMONY STRONGLY OUTWEIGHED THE GOVERNMENT'S EVIDENCE ON CRITICAL POINTS

Although acknowledging in the abstract that the Court must "evaluate for itself the credibility of the witnesses" (Opp. 2:21), the Government ignores the implications of the Rule 33 standard for its case. As the Opening Memorandum demonstrated (at 3-6), the Government's principal witnesses suffered from serious credibility deficiencies. Eric Borrmann and Evan Collins made prior

statements to Company counsel and to federal prosecutors and agents that directly contradicted their most important testimony at trial. Mr. Collins also pleaded guilty to insider trading and had much to gain by offering testimony favorable to the Government. Robert Stavers and Hans Winters had not spent any appreciable time reviewing NAI's accounting since the year 2000—a lack of analysis that was reflected in their noncommittal and inconclusive testimony that various buy-in terms "would raise questions." Opening Memorandum ("Rule 33 Br.") 3:8-4:2. The Government does not deny these deficiencies at all. Instead, it simply argues that the jury must have "believed the government's case" and "not believe[d] the defendant's experts" (Opp. 11:18-19)—an argument that has no place in a Rule 33 context, which calls for the Court's own independent evaluation of credibility to determine whether the evidence as a whole "weigh[s] heavily against the verdict." *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1213 (9th Cir. 1992).

Instead of attempting to rehabilitate its own witnesses, the Government engages in an inconsequential critique of the defense's experts. The Government does not discuss Mr. Lucas at all, and its discussion of Mr. Leonard opens with an attempt to downplay his qualifications and exhaustive review of materials. But the Government's arguments only highlight how favorably Mr. Leonard's credibility compares to that of the Government's own witnesses.

The Government quips that Mr. Leonard had only audited "three or four" software companies before (Opp. 11:20), but he had over 25 years' experience auditing public companies (XIII Tr. 1570:19-1572:23) and was accepted as an expert without objection. Hans Winters, by contrast, had only *one* previous software client and had no experience in auditing sell-in accounting before going to NAI on a "secondment" from Holland. VIII Tr. 1162:23-1163:9. And Mr. Leonard's expert opinion rested on an analysis of a vast array of materials from NAI, PwC, and Ingram, including all of the PwC workpapers from the period; NAI's computerized accounting system, invoices and invoice registers, debit memo summaries, and e-mail traffic; Ingram's purchase orders, debit memos, and e-mail; and the reports and transcripts of the Government's witness interviews. XIII Tr. 1576:13-1577:4. Messrs. Stavers and Winters did no such analysis. Yet the Government calls this a "limited review," apparently because Mr. Leonard supervised a team of other accountants and did not review every page himself. Opp. 11:23-24. The Government's

complaint is ironic in light of its position that Messrs. Stavers and Winters could offer testimony sufficient to uphold a jury verdict as to what documents PwC did and did not see between seven and nine years previously—even though "six or seven" PwC auditors worked on NAI's audits (VIII Tr. 1163:16-19); Mr. Stavers admitted that he did not see all of the documents his staff saw and had not kept copies of everything he did see (VII Tr. 890:13-18); and cross-examination established that his memory was limited in many critical respects.[1]

Importantly, the Government does not engage the main thrust of the accounting testimony that Messrs. Lucas and Leonard provided. The experts' testimony decisively tipped the "strong weight" of the evidence against the Government.

*No Evidence That Reserves Were Not Reasonably Estimable.* The Government offered no testimony as to NAI's reserves for estimated future discounts, rebates, returns, and the like. *See* Rule 29 Reply Br. 2:3-25. By contrast, Mr. Lucas testified that companies are generally able to make reasonable estimates and maintain reserves, thereby permitting the use of sell-in accounting even where there are broad rights of return and other concessions that amount to discounts from the gross sales price. Rule 33 Br. 7:14-24. And Mr. Leonard testified—consistent with PwC's own conclusions in its audits—that nothing in the buy-in transactions or PwC's workpapers suggested that NAI's use of sell-in accounting was improper. *Id.* 7:22-8:5.

The Government asserts that it "impeached" Mr. Leonard by means of a methodologically unsound demonstrative that was displayed briefly during the Government's closing argument. Opp. 14:15-17; XVI Tr. 1866:23-1867:9. The Government's demonstrative was never shown to Mr. Leonard or to the defense prior to its use in summation. And even in its Opposition, the Government makes no effort to justify or even explain its methodology as a matter of accounting. The Government cites Mr. Leonard's testimony (Opp. 15:6 (citing XIII Tr. 1583)) for the proposition that NAI was required to take $111 million in reserves for the first quarter of 2000, but the cited

---

[1] For instance, Mr. Stavers could not remember how much PwC was paid in fees during the period at issue (VII Tr. 898:9-16, 900:5-9); whether the scope of PwC's audit work varied from year to year (*id.* 900:10-12); the mechanics of how NAI recognized revenue (*id.* 916:12-917:4); PwC's process of requesting invoice registers to test revenue recognition (*id.* 925:19-24); PwC's analysis and testing of debit memos (*id.* 928:5-8); the different types of reserves NAI maintained (*id.* 931:1-7); or the revenue cycle at NAI (*id.* 938:6-21).

Case No. CR-04-0201-MJJ   3   **DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF RULE 33 MOTION FOR NEW TRIAL**

page says nothing of the kind and does not even discuss the June 2000 payment to NAI (DX832) on which the Government supposedly based its demonstrative. Nor does the Government dispute the fact that over $86 million of the $111 million in debits taken in connection with the June 2000 check were for deductions taken in *the same quarter*, and therefore required no reserve at all. Rule 33 Br. 21:17-22:5. The Government does not suggest that NAI's reserves could not cover the remaining $25 million. *Cf.* DX1158 (NAI's reserves for the first quarter of 2000 exceeded $47 million). The Government's misguided attempt to "impeach" Mr. Leonard says far less about Mr. Leonard's credibility than it does about the Government's failure to address the fundamental accounting issues in this case.

The Government's misleading use of DX832 emphasizes the danger of allowing the Government to charge, and the jury to find, GAAP violations without a GAAP expert. *See* Rule 29 Br. 12:3-13:8; Rule 29 Reply Br. 6:7-7:24. Unfettered by any reliable accounting methodology—and impervious to cross-examination—the Government engaged in speculative computations regarding reserves (described above) and materiality (*see* Rule 29 Reply Br. 8:18-10:5) that had no basis in GAAP and, indeed, were demonstrably wrong. There is an unacceptable risk that the jury was misled or confused into convicting Mr. Goyal on the basis of the Government's argument. A verdict is against the great weight of the evidence when it cannot be supported other than through untested and inaccurate calculations argued for the first time in closing by Government attorneys.

*No Evidence of Materiality*. Mr. Lucas's testimony further confirmed the Government's failure to establish a material effect on NAI's financial statements. The Government's materiality evidence—Stipulation No. 1 (GX681)—depended on the assumption that NAI's entire distribution business should have been on sell-through accounting. Mr. Lucas testified that, even if some part of an Ingram quarter-end transaction should not have been on sell-in accounting (a proposition that was not proven anyway), that would not preclude the use of sell-in accounting for other parts of that quarter-end transaction, other transactions with Ingram, or transactions with other distributors. XIII

Tr. 1550:9-11 ("You could easily have one product or one product line or one customer that had deals that created problems with this that wouldn't affect the rest of the business.").[2]

The Government not only fails to address Mr. Lucas's testimony, but actually appears to *accept* it. The Government does not contend that NAI's entire distribution business should have been on sell-through accounting, and indeed acknowledges that its arguments are directed not to NAI's entire business, but only to "the proper accounting *of the underlying transactions*." Opp. 6:23 (emphasis added); *see also* Opp. 8:16-17 (discussing "NAI's revenue recognition abilities *on the related transactions*" (emphasis added)). Nor does the Government suggest that Stipulation No. 1 provided any direct proof of materiality. Instead, the Government mounts an eleventh-hour attempt to calculate materiality itself. Opp. 8:22-28. As is explained in the Rule 29 Reply (at 8-10), the Government's unexplained calculations—never presented to the jury—are unsupported speculation that do not even pass muster under Rule 29. They certainly cannot withstand the "strong weight" of the expert testimony showing lack of materiality.

*No Evidence of a "Significant Obligation" to Directly Bring About Resale.* Messrs. Lucas and Leonard both testified that the "significant obligation" test under FAS 48 impeded the use of sell-in accounting only when the buyer/distributor had no role at all in reselling the product and essentially acted as a warehouse. Rule 33 Br. 9:11-10:5. Mr. Lucas testified that a seller/manufacturer could retain "significant involvement" in a resale without disqualifying itself from using sell-in accounting for the transaction. XIII Tr. 1528:5-13. The Government did not contest this interpretation of FAS 48.

No Government witness testified that Ingram operated as a non-selling warehouse or that NAI's use of NetTools in 1998 and early 1999 turned Ingram into a warehousing operation for NAI products. The Government's own witnesses testified to the contrary. IV Tr. 449:23-450:15 (Ward); *id.* 531:6-533:1 (Ward); X Tr. 1380:13-1381:2 (Cline). Based on those facts and his accounting expertise regarding FAS 48, Mr. Leonard opined specifically that the NetTools arrangement did not constitute a "significant obligation" under FAS 48. XIII Tr. 1607:18-20. Moreover, as Mr. Leonard

---

[2] Moreover, even if sell-in accounting were inappropriate for some deals, Mr. Lucas explained that there were alternatives other than sell-through accounting. XIII Tr. 1545:8-1546:7.

| Case No. CR-04-0201-MJJ | 5 | DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF RULE 33 MOTION FOR NEW TRIAL |

1  noted (and Mr. Collins testified), NetTools sales were "a fraction of the sell-out from all the
2  distributors," which showed that "the distributors were clearly selling … substantial amounts of
3  product on their own."  XIII Tr. 1607:21-1608:5; *see also* VIII Tr. 1215:15-23.  Thus, even if certain
4  NetTools transactions could be said to have involved an "obligation" on NAI's part to directly bring
5  about resale of product, the strong weight of the evidence—indeed, the *only* evidence—is that it was
6  not "significant" in the context of NAI's Ingram business.

7       <u>*PwC Knew of All Sales Terms*</u>.  As Mr. Leonard testified, PwC's workpapers demonstrated
8  its knowledge that NAI used the *buy-in letters themselves* in order to calculate appropriate reserves
9  for estimated future liabilities in 1998.  XIII Tr. 1636:11-19 ("[T]he PriceWaterhouse workpapers
10 showed that the company accrued or reserved for amounts that they estimated were owed, *and they*
11 *used the terms that were in the buy-in agreement*." (emphasis added)).  In other words, PwC's
12 workpapers demonstrate its knowledge of the buy-in letters, thereby vitiating any claim that they
13 were concealed from PwC or that PwC was unaware of them.  The Government does not even
14 address, much less rebut, this testimony.  Instead, it relies exclusively on the assertions of Messrs.
15 Stavers and Winters that they did not recall seeing buy-in letters.  Opp. 9:24-10:2.  But they could
16 not speak for their colleagues, who did not testify, and their own memories were proven to be
17 unreliable in many respects—which is understandable, given the passage of seven to nine years and
18 their failure to review pertinent audit documents prior to trial.  Rule 33 Br. 13:1-14:2; *supra* note 1.
19 Coupled with the fact that PwC indisputably saw debit memos, which referred to and included buy-
20 in letters (Rule 29 Reply Br. 10:14-11:12), as well as schedules summarizing NAI's various
21 distributor concessions (rebates, price protection, returns, etc. (DX175; XIII Tr. 1594:7-24)), Mr.
22 Leonard's testimony confirms that PwC in fact was aware of, was provided with, and saw all
23 material sales terms that the Government now claims were withheld.

24      The Government suggests that Mr. Leonard "support[ed]" the Government's argument that
25 "PwC never saw any of the actual debit memos" (Opp. 11:24-25), but this is simply wrong.  The fact
26 that the debit memos that *the Government itself marked and placed in evidence* are "Bates stamped
27 IM" (Opp. 11:26) is irrelevant.  Mr. Leonard was not a keeper of the records, nor did he (or any
28 other witness) testify that the Bates numbers given to documents in this case were indicative of

1  whether PwC saw copies of the same documents in 1998, 1999, or 2000.  On the contrary, the

2  Government's own witnesses and documents confirmed many times over that PwC did in fact see,

3  review, and test debit memos.  *See* Rule 29 Reply Br. 10:14-11:12.  Nor does Mr. Leonard's

4  acknowledgement that "there were some accounting errors in the November '99 checks" (XIII Tr.

5  1675:7-8) support the Government's case.  Mr. Leonard explained that some of the payments in the

6  fourth quarter of 1999 were "charged by Terry Davis, the controller, to the tax reserve, rather than

7  being charged against revenue reserves."  *Id.* 1675:21-23.  Neither Mr. Leonard nor the Government

8  tied this issue to sell-in accounting or to any of the charges against Mr. Goyal.

9       *No Evidence of Criminal Intent.*  The Government's evidence of *mens rea* in this case was

10 minimal at best.  *See* Rule 29 Reply Br. 11:21-14:22.  Moreover, the Government makes no effort to

11 rebut the clear evidence of Mr. Goyal's good faith.  The Government's own witnesses were

12 unanimous about Mr. Goyal's honesty.  VI Tr. 747:15-748:7 (outside analyst John Powers viewed

13 Mr. Goyal as "straightforward"); *id.* 737:10-22 (Powers felt his discussions with Goyal were

14 "appropriate and legal"); *id.* 800:8-21, 801:14-19, 803:16-21 (Denend saw Mr. Goyal as a tireless

15 worker, always professional, and honest).  He was "completely cooperative" with PwC and "made

16 significant improvements in the financial operations of the company."  VIII Tr. 1166:19-1167:12

17 (Winters).  He "didn't put any limits on any aspect of PwC's audits."  VII Tr. 897:20-898:4

18 (Stavers).  He routinely took more conservative accounting positions than were advocated by others

19 at NAI (including the CEO, William Larson), even when that led to recognition of less revenue in

20 the short term.  XII Tr. 1477:4-23 (Watkins).  And he decided to forgo a buy-in deal with Ingram in

21 the second quarter of 1999—a decision that likewise decreased NAI's revenue—in order to reduce

22 channel inventory.  VI Tr. 809:8-13 (Denend).  After working with Mr. Goyal for over three years,

23 Mr. Stavers of PwC saw no indication that Mr. Goyal was anything less than "forthright."  VII Tr.

24 903:1-15; DX 502-11.  This strong evidence of good faith from multiple witnesses—which the

25 Government does not even address, let alone undermine—is irreconcilable with the Government's

26 theory of Mr. Goyal's state of mind.

27

28

## II. THE IMPROPER OPINION TESTIMONY BY LAY WITNESSES OBSCURED THE WEAKNESS OF THE GOVERNMENT'S CASE

The Government's response to the Rule 29 motion shows that the defense was right to be concerned about the possibility of improper expert testimony from lay witness Hans Winters. If anything, the defense underestimated the problem. Despite its repeated assurances that Mr. Winters would not testify as a GAAP expert (VI Tr. 714:1-4; VIII Tr. 1188:15-18), the Government now asserts that Mr. Winters testified—throughout over sixty pages of transcript—that "specific conditions of the IM buy-in letters *were inconsistent with specific requirements under GAAP*." Opp. 8:13-17 (emphasis added) (citing VIII Tr. 1123:25-1187:4). The Government's argument attempts to use Mr. Winters' testimony in precisely the way that is forbidden by Fed. R. Evid. 701: as "opinions or inferences . . . based on scientific, technical, or other specialized knowledge."[3]

The Government's suggestion that Mr. Winters offered accounting opinions as a "percipient witness[]" (Opp. 13:2) cannot withstand scrutiny. Under Rule 701, a lay witness may offer an opinion based on the rational application of common knowledge to his own perceptions—for example, that a person he met appeared to be happy, or that a car that he saw appeared to be speeding. But a statement that "our opinion would no longer be valid or actually accurate" (VIII Tr. 1161:24-25) does not constitute a valid lay opinion.[4] Rather, it is a judgment as to how a past audit opinion based on GAAP would change in light of changes in underlying facts—in other words, an opinion involving the application of specialized and technical knowledge to a factual scenario the witness did not perceive. That is classic expert testimony, which was not receivable from this lay

---

[3] As is further discussed in the Rule 29 briefing, the only reasonable reading of Mr. Winters' testimony is that the buy-in terms would raise "questions" that would prompt further inquiry. Rule 29 Br. 4:26-5:11; Rule 29 Reply Br. 2:25-5:3. Accordingly, Mr. Goyal's Rule 33 motion only addressed two occasions where Mr. Winters answered hypothetical questions and purported to offer a GAAP opinion. Rule 33 Br. 18:4-19:12. However, if the argument in the Government's Opposition is correct, such that virtually all of Mr. Winters' testimony is considered to include expert conclusions that specific deal terms violated GAAP, that only strengthens the need for a new trial under Rule 33.

[4] As is pointed out in the Rule 29 briefing, Mr. Winters' "opinion" was surrounded by so many caveats and provisos as to have no more certainty than the "questions" he raised. VIII Tr. 1161:20-24 ("what I've seen today"; "would have raised doubt"; "all the conditions need to be reviewed"; "what I've seen today"; "could have" a material impact).

| Case No. CR-04-0201-MJJ | 8 | DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF RULE 33 MOTION FOR NEW TRIAL |

1  witness.  *See* Rule 33 Br. 17:23-18:3 (discussing prohibition on lay witnesses' answering
2  hypothetical questions).

3  The Government asserts that Mr. Winters' opinion was the "most direct evidence that the
4  government could present" to show that the buy-in terms were material to the audits.  Opp. 12:27.
5  But the Government seeks to use Mr. Winters' testimony for far more than that the buy-in terms
6  "would significantly alter the total mix of information" available to PwC.  Opp. 12:26.  The
7  Government relies on Mr. Winters' opinions *as proof of GAAP violations* (Opp. 8:13-14), just as it
8  did in its rebuttal statement shortly before the jury retired (XVI Tr. 1946:22-1947:15).  The
9  Government's Rule 33 discussion tellingly does not try to defend (or even acknowledge) the
10 admissibility of Mr. Winters' GAAP opinions for this central purpose.  *See Ghent v. Woodford*, 279
11 F.3d 1121, 1131 (9th Cir. 2002) (erroneous admission of expert testimony was not harmless because
12 the Government's use of the evidence at trial "demonstrate[s] just how critical the State believed the
13 erroneously admitted evidence to be"); *United States v. Kaplan*, __ F.3d. __, 2007 WL 1087270, at
14 *11 (2d Cir. Apr. 11, 2007) (admission of lay opinion testimony was not harmless where it was the
15 primary Government evidence on "the central disputed issue in the case," where the Government
16 "repeatedly called the jury's attention to [the] lay opinion testimony" in its opening and closing, and
17 where the evidence "was not cumulative of properly admitted evidence").[5]

18 The Government cannot argue both that Mr. Winters opined that GAAP was violated (Opp.
19 8:13-14) and that he did not give expert testimony (Opp. 12:20-22).  If Mr. Winters opined that
20 GAAP was violated, then admission of the evidence violated Rule 701 and requires a new trial.  If he

---

[5] The Government attempts to defend its statements in closing argument piecemeal (Opp. 13:5-16:4), but never addresses the cumulative effect that its misstatements (and the improper lay opinions) had in light of the weakness of the Government's case on critical elements of the crimes charged.  *See* Part I *supra*; Rule 33 Br. 2:20-16:9.  Even if the Government were correct that each point would not separately warrant a new trial, they had a serious harmful effect in the aggregate, namely making an very weak case for the prosecution appear stronger than it was.

Case No. CR-04-0201-MJJ          9          DEFENDANT'S REPLY MEMORANDUM IN
                                             SUPPORT OF RULE 33 MOTION FOR NEW TRIAL

did not opine regarding GAAP violations, then the Government's proof on that point could not support a conviction. Rule 29 Reply Br. 2:25-5:6. Either way, the verdict cannot stand.[6]

### III. THE ERRONEOUS "RECKLESSNESS" INSTRUCTION REQUIRES A NEW TRIAL

The jury was instructed that it could convict Mr. Goyal for "willfully" making false statements in NAI's SEC filings without finding "actual knowledge" of falsity, if it found that he acted with "reckless indifference as to the truth or the falsity of the statement." XVI Tr. 1822:5-6. As was shown (Rule 33 Br. 24:4-25:12), this instruction is not supported by *United States v. Tarallo*, 380 F.3d 1174 (9th Cir. 2004), which involved only a fraudulent scheme or practice under the first provision of 15 U.S.C. § 78ff, not the second provision at issue here—a point the Government does not deny. The Government contends that the issue is "moot" because the jury was also instructed that it needed to find that Mr. Goyal "acted knowingly (and with intent to defraud)." Opp. 16:20-25. This argument appears to concede that the Government was required to prove that Mr. Goyal knew that the accounting was wrong. The Government also does not dispute the correctness of Mr. Goyal's statutory argument, namely that a defendant cannot be convicted of making a false statement under the second clause of section 78ff without proof that he actually knew the statement was false. Rule 33 Br. 24:13-15. In fact, the Government's assertion that it had to prove that Mr. Goyal knew the accounting was false rests on the same logic. When the alleged criminal act is making a false statement, a defendant cannot have performed it willfully or with intent to deceive without knowing the statement was false.

The Government's concession that it needed to prove that Mr. Goyal knew the accounting was incorrect does not "moot" an erroneous instruction that told the jury that recklessness was sufficient. It is the Government's burden to prove that the error was harmless. *United States v. Moran*, __ F.3d __, 2007 WL 1952393, at *7 (9th Cir. July 6, 2007) (citing *United States v.*

---

[6] The Government does not deny that Mr. Collins gave improper opinion testimony when he said that he did not "believe" that Mr. Goyal "wanted" Mr. Collins to show buy-in letters to PwC. *See* Rule 33 Br. 15:7-16:9, 16:26-17:7; *Kaplan*, 2007 WL 1087270, at *6 (granting Rule 33 motion). Nor does it dispute that the testimony was highly significant given the paucity of other evidence of *mens rea* regarding concealment of buy-in letters—on the contrary, the Government confirms its importance by relying on it in its Opposition (at 10:27). Together with the other matters discussed, this improper opinion evidence mandates a new trial under any standard.

*Seschillie*, 310 F.3d 1208, 1214 (9th Cir. 2002)).  Given that the Government itself proposed the "reckless disregard" instruction and opposed Mr. Goyal's objection to it, its suggestion that the instruction was harmless or "moot" is implausible.  "Willfulness" was a prominent part of the Court's *mens rea* instruction and, indeed, was the first term of the *mens rea* instruction the Court defined.  XVI Tr. 1821:19-1822:12.  The harmful nature of the recklessness instruction is also shown by the scant nature of the evidence of Mr. Goyal's mental state.  *See United States v. Aguilar*, 80 F.3d 329, 333-334 (9th Cir. 1996) (erroneous jury instruction not harmless where evidence against defendant was not overwhelming); Rule 29 Reply Br. 11:21-14:22.  The Court cannot speculate that the jury might have disregarded an erroneous instruction in the Government's favor and followed a correct one in the defendant's favor.

## CONCLUSION

For the foregoing reasons and those stated in the Rule 33 Opening Memorandum, the Court should set aside the verdict of guilt on each and every count and order a new trial.  If the Court grants judgment of acquittal under Rule 29, this motion should be granted conditionally under Rule 29(d)(1).

Dated: July 26, 2007

Respectfully submitted,

PRABHAT K. GOYAL

/s/  Stephen A. Jonas
WILMER CUTLER PICKERING
    HALE AND DORR LLP
Stephen A. Jonas
Ronald C. Machen (admitted *pro hac vice*)