WILMER CUTLER PICKERING
  HALE AND DORR LLP
Stephen A. Jonas (stephen.jonas@wilmerhale.com)
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Ronald C. Machen (ronald.machen@wilmerhale.com)
Matthew Holmwood (matthew.holmwood@wilmerhale.com)
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363

Attorneys for Defendant

PRABHAT K. GOYAL

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>v.<br><br>**PRABHAT GOYAL,**<br><br>**Defendant.** | **Case No. CR-04-0201-SI**<br><br>**DEFENDANT PRABHAT K. GOYAL'S SENTENCING MEMORANDUM, AND RESPONSE TO THE PRESENTENCE REPORT**<br><br>**Hearing Date: October 2, 2008**<br>**Hearing Time: 3:00 p.m.**<br>**Location: Courtroom 10, 19th Floor**<br>**Before: Honorable Susan Y. Illston** |

Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ ii

I.      OVERVIEW OF THIS SUBMISSION ........................................................1

II.     MR. GOYAL'S OFFENSE CONDUCT (§ 3553(a)(1) & (a)(2)(1)) ............2

III.    MR. GOYAL'S LIFE AND CHARACTER (§ 3553(a)(1))—A DEVOTION TO
        FAMILY, COMMUNITY AND COLLEAGUES ........................................5

        A.      A Loving and Devoted Husband, Father and Son—"The Gentlest and
                Kindest of Men"..................................................................................6

        B.      A Quality and Caring Neighbor and Member of the Community ......8

        C.      A Quality Colleague—Admired for his Honesty, Integrity and
                Compassion........................................................................................11

        D.      A Productive Member of Society ....................................................12

IV.     THE COURT SHOULD IMPOSE A BELOW-GUIDELINES SENTENCE
        UNDER 18 U.S.C. § 3553(a)......................................................................13

        A.      A Probationary Sentence Is Sufficient to Provide Just Punishment and
                Promote Respect for the Law...........................................................15

        B.      Adequate Deterrence Is Achieved Without a Jail Sentence.............16

        C.      Imposing a Sentence of Imprisonment Would Create an "Unwarranted
                Sentence Disparity" ........................................................................16

V.      RESPONSE TO PRE SENTENCE REPORT .............................................19

VI.     PROPOSED GOYAL SENTENCE.............................................................21

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Gall v. United States*, 128 S.Ct. 586 (2007).................................................................16

*United States v. Anderson,* No. 07-11848, 2008 WL 525669 (11th Cir. Feb. 28, 2008)............14

*United States v. Caperna*, 251 F.3d 827 (9th Cir. 2001) ...............................................17

*United States v. Causey*, No. H-04-025-SS, 2005 WL 3560632 (S.D. Tex. Dec. 29, 2005).......3

*United States v. Dooley*, 3:04-cr-00387 (D. Or.) (docket)...........................................18

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006), (2007) .................................3, 4

*United States v. Jamal*, 1:05-cr-00359 (D.D.C) (docket) ...........................................18

*United States v. McQuillan,* 07-cr-00017, 2007 U.S. Dist. LEXIS 72717 (S.D.N.Y. Sept. 26, 2007) .........................................................................................18

*United States v. Reyes*, 3:06-cr-00556 (N.D. Cal. Nov 27, 2007) (order) .................4

*United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008)...................................................18

*United States v. Yeaman*, 248 F.3d 223 (3d Cir. 2001) ...........................................16

*United States v. Whitehead,* 532 F.3d 991 (9th Cir. 2008) ......................................17

## OTHER AUTHORITIES

*SEC v. Brady*, SEC Litigation Release No. 20005, 2007 WL 5057774 (Feb. 15, 2007)...........18

*SEC v. Graham*, 2007 SEC Litigation Release No. 20163, 2007 WL 1814115 (June 22, 2007) ...............................................................................................19

*SEC v. Malmstedt*, SEC Litigation Release No. 17524, 2002 WL 1021415 (May 21, 2002) ...............................................................................................19

*SEC v. Sweeney*, 2008 SEC Litigation Release No. 20493, 2008 WL 680739 (Mar. 13, 2008) ...............................................................................................19

*SEC v. System Software Assocs., Inc.*, 2002 SEC Litigation Release No. 17770, 2002 WL 31236425 (Oct. 7, 2002) .................................................................19

*SEC v. Take-Two Interactive Software Inc., et al.,* SEC Litigation Release No. 19260, 2005 WL 1367391 (June 9, 2005) .........................................................18

## FEDERAL STATUTES

18 U.S.C. § 3553........................................................................................ passim

**MISCELLANEOUS**

David Voreacos and Bob Van Voris, *Bush Fraud Probes Jail Corporate Criminals Less Than Two Years,* Bloomberg, Dec 13, 2007 ...................................................................18

David Weisburd & Elin Waring, *White-Collar Crime and Criminal Careers* (2001) .............16

# I.      OVERVIEW OF THIS SUBMISSION

We write to express our view about a reasonable sentence for our client, Prabhat K. Goyal, who is scheduled to be sentenced by this Court on October 2, 2008, for securities fraud and false statements to auditors arising from decisions he made as Chief Financial Officer of Network Associates, Inc. ("NAI") in the period 1998 to 2000.  Considering the offense and Mr. Goyal's heretofore unblemished background, the United States Probation Office recommended a sentence of one year and one day in its Presentence Report ("PSR"), a term below the sentence indicated by the Sentencing Guidelines, along with supervised release and a $200,000 fine.[1]  For the reasons that follow, we respectfully submit that 5 years probation, with a 1 year term of home detention, a fine and substantial community service better balances the factors articulated in 18 U.S.C. § 3553(a).

Part I of this memorandum describes the "offense conduct," and identifies for the Court the aspects of the verdict that demonstrate the differences between this case and other typical securities fraud prosecutions.  Part II discusses Mr. Goyal's "character and history," drawing from testimony at trial and the 100 letters written by former colleagues, family members, friends and business associates submitted to the Court on his behalf.[2]  These letters describe the man we have come to know—a humble and simple man who is an asset to both his family and community.  Part III outlines the legal standard under § 3553(a) as well as the other factors the Court may consider.  In this section we address the substantial punishment Mr. Goyal has already suffered as well as the probation and home confinement sentences issued to two NAI employees prosecuted for related

---

[1] As the Court is aware, the parties stipulated to a calculation of the Sentencing Guidelines, which results in a sentencing range of 37 to 46 months.  The Guidelines stipulation permits the parties to "present to the United States Probation Office or the Court any facts relevant to sentencing; and/or (ii) make any arguments relevant to the factors set forth in Title 18, United States Code, Section 3553(a), except that the United States agrees that it will not argue in favor of a sentence greater than the stipulated Guideline range."  (Dkt. 329 at ¶ 7).

[2] One hundred character letters submitted on Mr. Goyal's behalf were provided to the Government and the Court in a single binder under a cover letter dated August 28, 2008.  A letter and musical piece from Meha Goyal, Mr. Goyal's daughter was sent to the Court by Fed/Ex on September 15, 2008.  A copy of Mr. Goyal's letter to the Probation Officer was submitted with the courtesy copy of this memorandum provided to chambers.

conduct.  The last two parts address Mr. Goyal's objections to the PSR and provide greater detail on our proposed sentence and community service opportunities.

As this Court knows, Mr. Goyal exercised his Constitutional right to a trial by jury and intends to appeal his conviction.  That decision does not reflect an absence of reflection, a lack of contrition or disdain for the legal system.  As evidenced by his decision to turn down a no-jail plea offer before trial,[3] Mr. Goyal honestly believes that the accounting decisions and judgments he made were not improper.  Nonetheless, he harbors considerable sorrow about the disruption his conduct caused his former colleagues and the company in which he took so much pride and to which he devoted so much energy.  *See* PSR at ¶¶ 21 & 63.  He also understands that this ordeal caused his family a tremendous amount of pain and suffering.  All of this  has caused him great shame.

## II.      MR. GOYAL'S OFFENSE CONDUCT (§ 3553(a)(1) & (a)(2)(1))

The jury found that Mr. Goyal made false statements about NAI's revenue by violating SOP 97-2 and improperly applying "sell-in" accounting to end of the quarter transactions with a distributor, and by failing to inform NAI's auditor of certain facts in order to protect the accounting treatment.  By using sell-in accounting, NAI was able to recognize some revenue from a sale to a particular distributor immediately rather than waiting until that distributor had sold the product.  During the period in question, Mr. Goyal received between $120,000 to $200,000 in bonuses that were related to the corporation's recognition of revenue and these bonuses were subsequently used as the measure of "loss" reflected in the Guideline calculation.  (Dkt. 329 at ¶ 4.)

Like all securities fraud convictions, Mr. Goyal's offense is undeniably serious.  But in assessing the seriousness of the offense under § 3553(a)(1) and (a)(2)(1), there are certain facts that distinguish this case from more typical "revenue recognition" prosecutions and other securities fraud prosecutions and help place it in context.

---

[3] The Government's no-jail plea offer was made without condition that Mr. Goyal cooperate in any other proceeding.

1    *First*, Mr. Goyal was not convicted for inflating NAI's performance through phantom

2    revenue or complicated sham transactions (XVI Tr. 1947:16-21 (Government Summation))—the

3    hallmark of a number of recent, high-profile securities fraud prosecutions like the ones brought

4    against former executives at Enron and WorldCom.[4]  Nor did Mr. Goyal run a Ponzi scheme or

5    boiler-room operation whose only conceivable purpose is to hurt others.  Mr. Goyal made the

6    decision to apply sell-in accounting (which was the "default" method used by companies at the time)

7    to legitimate arm's length transactions with a single distributor and the jury determined that he did so

8    knowing it was wrong to do so.  These decisions affected the timing of revenue—and revenue would

9    have been both lower and higher in various quarters under the alternative methodology—but it is

10   important to note that changing the accounting treatment to the treatment advocated by the

11   government (sell-through accounting) would have resulted in no overall loss of revenue.  (GX 681 at

12   ¶¶ 8-9 (stipulation)).

13       *Second*, the market knew that NAI used sell-in accounting and immediately recognized

14   revenue from its deals with its distributors.  In fact, John Powers, a Government witness and a

15   securities analyst who followed NAI during the period, testified that there was "nothing unusual"

16   about NAI using sell-in accounting.  VI. Tr. 765:4-766:11.  He further testified that he knew NAI did

17   much of its business in heavily-discounted quarter-end deals with distributors and he considered that

18   fact when evaluating the company.  *Id.* 759:13-761:12, 762:6-764:22 (Powers).  *See also* XII. Tr.

19   1448:23-1451:9, 1453:1-15 (Smith).

20       Indeed, this is a rare criminal securities fraud case where two market analysts who followed

21   the company during the period of the offense conduct (indeed, the principle two analysts for NAI at

22   _____

23       [4] *See, e.g.*, *United States v. Ebbers*, 458 F.3d 110, 113-17 (2d Cir. 2006) (describing a
     dizzying array of knowingly fraudulent conduct at WorldCom designed to generate billions of

24   dollars of illegitimate revenue and explaining that the company's stock collapsed and the company
     declared bankruptcy almost immediately after the fraud became public); *United States v. Causey*,

25   No. H-04-025-SS, 2005 WL 3560632, at *6 (S.D. Tex. Dec. 29, 2005) (cataloguing, in part, the
     extent of the fraud at Enron, including "engaging in transactions designed to close gaps between

26   Enron's actual results and its stated financial reporting goals, by manufacturing earnings through
     sham transactions, and by backdating documents to inflate the value of Enron's investment

27   portfolio").

28

**Case No. CR-04-0201-SI**                    3          **DEFENDANT'S SENTENCING MEMORANDUM**

1   the time) have attested to the defendant's honesty and character.  Mr. Powers described Mr. Goyal at

2   trial as "straightforward" and conservative in describing the company's prospects.  VI. Tr. 747:15-

3   748:7, 749:21-25.  Bruce Smith, a stock analyst who testified during the defense case, and

4   subsequently submitted a letter to this Court explaining that he spent "countless hours interfacing"

5   with Mr. Goyal, during which Mr. Goyal "conducted himself with high integrity and

6   professionalism."  (Bruce Smith letter.)  As discussed in more detail below, the views of Mr. Powers

7   and Mr. Smith are echoed by many of Mr. Goyal's business associates and colleagues.

8       *Third*, NAI continued to thrive well after the relevant conduct stopped.  Leslie Denend, a

9   long-time member of NAI's Board of Directors, testified at trial that NAI became one of the two

10  largest antivirus and network security companies in the world during Mr. Goyal's tenure at the

11  company and that it remains so today.  VI Tr. 803:22-804:13.  Consistent with these facts, as

12  opposed to an Enron or WorldCom-like collapse, the parties stipulated that "loss" should be

13  measured as the $120,000 to $200,000 Mr. Goyal received in revenue-based bonuses rather than

14  according to a shareholder loss theory the Government traditionally pursues in securities fraud cases.

15  (Dkt. 329 at ¶ 4).  *See, e.g., Ebbers*, 458 F.3d at 127-29 (2d Cir. 2006) (calculating shareholder

16  losses as "well above $1 billion"); *see also* Order re Sentencing Guidelines at 5-7, *United States v.*

17  *Reyes*, 3:06-cr-00556 (N.D. Cal. Nov. 27, 2007) (addressing Government's argument for a

18  shareholder loss theory in a non-revenue fraud case).  Additionally, the Probation Office

19  recommends no restitution.  *See* PSR Recommendation p. 1.

20      *Fourth*, Mr. Goyal's accounting decisions were not motivated by greed or self-

21  aggrandizement.[5]  Mr. Denend testified that Mr. Goyal never asked the Board of Directors for a

22  bonus or anything else for himself.  VI Tr. 805:6-12.  Virginia Gemmell, a member of the

23  Compensation Committee of NAI's Board, wrote a letter to the Court describing Mr. Goyal as

24  "particularly conservative in assessing his own merit during annual reviews."  Like Mr. Denend, Ms.

25  _____

26      [5]  This fact distinguishes this from many cases such as *Ebbers*.  As the Court of Appeals for
    the Second Circuit noted when affirming his verdict, Ebbers "had powerful personal as well as
27  occupational motives" to inflate WorldCom's stock price because he had "borrowed over $400
    million from banks, using his stock in WorldCom as collateral" to finance his "investment and
28  consumption habits" that had "outpaced his income."  *Ebbers*, 458 F.3d at 113.

1   Gemmell does "not recall Prabhat ever asking for a raise or bonus for himself." (Virginia Gemmell

2   letter.) Peter Watkins, who worked alongside Mr. Goyal at both NAI and Sun, explains that "[i]n

3   almost daily interactions during his five years at [NAI], I always found Prabhat to be ethical,

4   straight-forward, clear and truthful," and the equal of any of the other eight CFOs he has worked

5   with in terms of integrity and honesty. (Peter Watkins letter.)

6           Mr. Denend's testimony and the letters from Ms. Gemmell and Mr. Watkins fit within the

7   consistent pattern of Mr. Goyal's life established by others who were interviewed by the Probation

8   Officer and have written to the Court on Mr. Goyal's behalf. They describe Mr. Goyal as a simple

9   and humble person without a trace of greed or self-importance. These traits are illustrated in actions

10  big and small. Mr. Goyal never used a company plane, a car with a driver, or any other perq

11  typically associated with corporate executives. XII Tr. 1485:13-1486:2 (Watkins). Mr. Goyal's

12  brother, who was interviewed by the Probation Officer, described Mr. Goyal as "generous [and]

13  honorable." In fact, he recalls Mr. Goyal calling him with an offer to share his first bonus as an

14  employee at Tandem Computers. *See* PSR at ¶ 48. A friend recalls Mr. Goyal calling a Chinese

15  restaurant and suggesting that it charge his credit card for an entrée the restaurant had inadvertently

16  left off the bill. Together, family and friends explain that Mr. Goyal "kept his same circle of friends

17  and acquaintances" when his career was ascending and "never needed luxuries or an ostentatious

18  display of affluence." (Letters from Rajat Gupta and Sanjay Gupta.) "Not once have I heard from

19  him on how well he was doing or how much he is earning. … For us, Prabhat was and always is the

20  humble fellow who is making us Indian tea on his kitchen stove." (Raju Chandra letter.)

21  **III.   MR. GOYAL'S LIFE AND CHARACTER (§ 3553(a)(1))—A DEVOTION TO
22         FAMILY, COMMUNITY AND COLLEAGUES**

23          Mr. Goyal was born in India in 1954, and came to the United States in 1980. He did so

24  despite his desire to return to India after his schooling in England because his parents wanted him to

25  pursue the opportunities he could find here. (Sanjay Gupta letter.) A United States citizen since

26  1995, Mr. Goyal is a loving and devoted husband, father and son, a quality and caring neighbor

27  (both in his immediate community and among immigrants from India living in the United States), a

28  colleague respected for his integrity (even from those who were directly affected by the decisions he

made) and a productive and valuable member of society despite the very real restrictions the investigation, indictment and subsequent conviction have placed on his opportunities.  In short, as the Probation Officer concludes in making a below-guidelines recommendation, Mr. Goyal has a "stellar background" and poses no risk of recidivism.

### A.   A Loving and Devoted Husband, Father and Son – "The Gentlest and Kindest of Men"

Mr. Goyal first met his wife Suruchi Mohan in 1984 at a gathering in India arranged by their parents.  They were married in 1985.  Ms. Mohan's letter describes her apprehension following the arranged marriage and her relief at the man she found after she traveled to America to live with him:

> It was a difficult journey for me.  I barely knew Prabhat and was leaving my family, friends, and the life I knew.  Stories abounded about women abused and left to fend for themselves. I was afraid of the sort of man I would find.
>
> I found Prabhat to be the gentlest and kindest of men.  Unlike so many men I had observed growing up, he never raised his voice to me, since I had no money of my own … he put his whole paycheck in my hands.

(Suruchi Mohan letter.)  Ms. Mohan's letter continues to describe Mr. Goyal opening his home to the Indian community, his generosity, humility and integrity, and his efforts to remain a productive member of his community.

Mr. Goyal's and Ms. Mohan's marriage remains strong today, having survived both the long hours Mr. Goyal put in while at NAI and the last excruciating eight years which have included the investigation, indictment, trial and conviction.  In 2005, their relationship took on a new challenge as she suffered a heart attack at age 45 while visiting family in India with Meha, their daughter.  In the immediate aftermath of the heart attack, Mr. Goyal flew back and forth to India, first to bring his daughter home for school, and then to accompany his wife on her return trip to the United States after she was medically cleared to travel.  (Nandan and Ashish Dixit letter.)  Since that time, Mr. Goyal has been seen by neighbors "taking daily walks with Suruchi" to aid her recovery and then guiding her through major related surgery.  (Daphne Luong letter.)  Ms. Mohan's recovery has been complicated by stress which exacerbates her conditions, and her physician has voiced her concerns given the obvious and continuing source of stress in her life.  (Sara Bunting letter.)  Mr. Goyal's

1   health has also deteriorated and he now suffers from Type II diabetes, hypertension, high cholesterol

2   and coronary arteriosclerosis.  *See* PSR at ¶ 51.

3          Their daughter, Meha, was born in 1990.  A number of family members and close friends

4   discuss Mr. Goyal's involvement in Meha's life and the love and support he provides and his tireless

5   encouragement of her interests and pursuits.  (*E.g.*, letters from Suruchi Mohan, Roshni Goel, and

6   Ashkok Seth.)  A family friend explains the closeness of their relationship:

7              Whenever we are all together, it is evident that she has the utmost respect
             and love for her dad.  It's not very often that you see a teenager wanting to
8              "hang out" with her father.

9   (Ellen Stuck letter.)  Family and friends have written the Court to address the impact this case has

10  had on Meha.  As one friend and neighbor writes:

11             In our thirty-five minute drive, two to three times per week to school I
             have seen the toll this lengthy process has taken on [Meha]. When she
12             emerges from the house in the mornings and walks to my car you can
             almost see the effect of the family's situation in her slow heavy walk.

13  (Sara Somers letter.)

14         Mr. Goyal's former assistant at NAI confirms that Mr. Goyal was a devoted parent when he

15  was working, making it a point to try to talk with Meha every afternoon after she arrived home from

16  school.  (Delores Medeiros letter.)  Another colleague recalls that when Mr. Goyal brought Meha to

17  work, "[h]e was so gentle and thoughtful with her that I knew he was a committed and proud Dad."

18  (Deepa Prashant letter.)

19         Meha is now an accomplished musician, and letters describe Mr. Goyal "patiently sit[ing]

20  through [Meha] practicing the same piece [of music] over and over," and his efforts to calm her

21  nerves before a performance.  (Letters from Chinmaya Gupta and Sridhar Jagannathan.)  In lieu of

22  writing a letter to the Court, Meha recorded a piece of music (which was sent to the Court on

23  September 15, 2008) because she felt more comfortable expressing her love and concern for her dad

24  in that way.

25         Mr. Goyal showed equal devotion to his own parents who remained in India.  Sanjay Gupta,

26  among others, writes of Mr. Goyal's initial desire to return to India after completing undergraduate

27  studies in the U.K. although "it would have been much less rewarding financially."  (Sanjay Gupta

28

letter.)  Mr. Goyal's decision to instead begin graduate studies in the States was "literally at his parents' behest and emotional persuasion."  Later, as they became ill, Mr. Goyal stood ready to give up his life in the United States and "move back to India to take care of them."  (Sanjay Gupta letter.)

Mr. Goyal's mother died in 1995 and his father passed away in August 2006.  Mr. Goyal's many transatlantic trips to do whatever he could for them—touched the hearts of Mr. Goyal's family, friends and colleagues alike.  (*E.g.*, letters from Aruna and Uday Bellary, Wallace Hong, Ashok Bansol, Paramod Bansal, Sanjay Gupta, Nandan and Ashish Dixit, Dr. Anjali Mohan, Nalin Goel and Dr. Chandra Gupta.)   The death of Mr. Goyal's father was particularly difficult for him.  Following his mother's death "Prabhat had made a commitment to his father to [] financially take care of his living arrangements and to be there as his health was declining and provide both moral and physical support."  (Raju Chandra letter.)  Mr. Goyal's father's final decline came in the months before the criminal trial, nonetheless, he traveled to India regularly to tend to his father and "when his father breathed his last, Prabhat was at his side and had been with him for almost a month."  (Dr. Angali Mohan letter.)  Afterward, Mr. Goyal quite remarkably turned his thoughts to his father's caregiver:

> With the death of Prabhat's father, work [for his father's caregiver] suddenly came to an end.  He was also unwell at that time.  Prabhat had him treated at the All India Institute of Medical Sciences in New Delhi and then took pains to have him placed in another job.  In my experience, this kind of commitment to the welfare of a caregiver is distinctly rare, at least in India.

(Dr. Angali Mohan letter.)

## B.    A Quality and Caring Neighbor and Member of the Community

Numerous friends from the Los Altos neighborhood, where the Goyals have lived since 1996, have written to this Court about Mr. Goyal's willingness to help and his unassuming and friendly nature.  (*E.g.*, letters from Kathy and Glen Putnam, Dick and Dianne Carter.)  An elderly neighbor recalls having a knee replacement procedure, after which the Goyals "came to visit and offered any help that I might need and also sent lovely flowers," although they had not known each other well before that.  (Mrs. Thomas McCall letter.)  A neighbor and friend describes him often "taking out recycling and trash while we are on vacation" and his thoughtful offer several years back

to host the neighborhood Christmas party after her husband lost his job. She also describes Mr.

Goyal's humble effort to bring their families comfort in the aftermath of September 11.

> It was a week or so after 9/11. We were all still in shock and feeling bleak. I was especially impacted, after just giving birth three months earlier to our second boy. Prabhat and his family came over and proposed we get together on the weekend to plant some flowers together just to feel more hopeful. Our two families worked together silently side-by-side early Saturday morning, planting the two trays of annuals on the small dirt area between our houses near the mailboxes. There was no need for words. Prabhat showed both Tyler (who was 6 then) and Meha how to plant the flowers.

(Daphne Loung letter.)

Perhaps the clearest description of Mr. Goyal's sense of responsibility and underlying

integrity is demonstrated by Sara Somers, a friend and neighbor with whom Mr. Goyal shares

carpooling duty, shuttling her son and Meha to school. Mrs. Somers writes that she only recently

learned (because he had never mentioned it) that Mr. Goyal happily drove her son to and from

school (a 35-minute drive each way) on days when Meha was sick. She also describes Mr. Goyal's

insistence that he meet his carpooling duty *even* during his trial.

> With more than adequate notice he arranged to drive extra days at the beginning of trial to ensure that if need be later in the trial I might drive more. I was more than willing to help out and even drive during the entire trial for all the kindness that they had shown my family and me. But Prabhat insisted and in the end I'm sure that he has driven more than his fair share despite the obvious distractions he has had.

(Sara Somers letter.)

Mr. Goyal's involvement in the community goes beyond geographic lines. In her letter, Mrs.

Mohan describes Mr. Goyal's "extraordinary involvement with our large, extended families and

friends and friends of friends – community as Indians see it." (Suruchi Mohan letter.) Letters from

this "community" underscore Ms. Mohan's observation. Mr. Goyal and his wife have quite literally

become parents and mentors for Indian immigrants who have come to Northern California and their

house routinely serves as a home away from home for those who visit during school breaks and

holidays.

A nephew, Rohan Seth, recalls arriving at Stanford from India and being embraced by Mr.

Goyal's support.

> Uncle Prahbat is one of the kindest and most generous people I know. I had never ever lived away from home before and he and his family went out of their way to make moving half way across the world an easy transition for me. … For my first summer away from home, I was invited for home cooked dinner every single day and was never once allowed to feel home sick.

(Rohan Seth letter.) Roshni Goel, a niece who began graduate studies at Stanford in Fall 2007, describes Mr. Goyal helping her settle in and then "spen[ding] many evenings with him practicing case studies for my interviews." (Roshni Goel letter.) Mr. Goyal's assistance gave both Rohan's and Roshni's parents great comfort. (Letters from Ashok and Niru Seth and Nalin Goel.) Nalin Goel says Mr. Goyal has been "a wonderful and caring local guardian to Roshni. The genuine warmth and affection radiated from him and his family has resulted in Roshni feeling 'at home' with them. He is a mentor for my daughter." (Nalin Goel letter.)

Many others describe coming to Mr. Goyal's home at the holidays, often at his expense, to enjoy their company and a sense of home and community. Atul Gupta, a cousin, came from India to attend the University of Texas and Mr. Goyal twice paid for him to visit. (Atul Gupta letter.) Alka Banjeree, another distant cousin, moved to New York from India with her husband and daughter just before the holidays and "Prabhat sent tickets for me and family to visit him at his home during Christmas, so that we would not feel lonely and isolated." (Alka Banjeree letter.) Neelmoy Biswas, a nephew, used Mr. Goyal's house as a "home away from home" after exams each semester, taking red-eye flights from Canada to find "Uncle Prabhat … always waiting for me with a smile at the airport." (Neelmoy Biswas letter.)

Others describe Mr. Goyal coming to them at a moment's notice. When a member of Mr. Goyal's extended family underwent bypass surgery, "Prabhat took it upon himself to make a personal visit to Texas to help [wife] Manju take care of me." (Pramod Bansal letter.) When Seema Bhushan lost her husband, Mr. Goyal's university classmate and friend, in a tragic automobile accident "Prabhat was the first to reach Dallas.… What is remarkable about Prabhat's commitment to his family and friends is that it has been fourteen years since that event, but he may be the only one who has stayed in touch with Ravi's wife Seema." (Bhagwan Chowdhry letter.)

Mr. Goyal's involvement in his Indian community has not just been about opening his home. Rather, as the letters attest, it has been about a genuine interest in others.  Rajat Gupta describes the Goyals trying to help his wife adjust to living in the United States, calling regularly, "speak[ing] to us for hours and really get[ting] us to talk about my wife's frustrations and challenges."  (Rajat Gupta letter.)  Preeti John writes of Mr. Goyal's encouragement and help after she moved to Lexington, Kentucky.  (Preeti John letter.)  For Mr. Gupta and others "his family has been an anchor for my wife and I in this country."  (Rajat Gupta letter.)

### C.    A Quality Colleague—Admired for his Honesty, Integrity and Compassion

Mr. Goyal was and is universally viewed by those who know him as a person of high character and integrity.  As the Government stated in its closing summation, "frankly, every witness that testified here liked Mr. Goyal.  I don't think there's any question about that." XVI Tr. 1943:25-1944:1.  Mr. Denend testified that he viewed Mr. Goyal as honest, tireless and professional, as well as a steadying force at NAI while the company grew rapidly.  VI Tr. at 799:16-800:21, 801:20-23, 803:7-21.  Former NAI employee and Government witness Chris Peterson testified that he thought Mr. Goyal was a good guy, a view he continued to hold after leaving NAI.  VII Tr. at 997:1-997:8.

Letters submitted by other NAI officers and employees of all levels—people whose lives were disrupted by his decisions—underscore Mr. Goyal's integrity and honesty, as well as his compassion.  Former NAI General Counsel Richard Hornstein writes that "Prahbat was a tremendous mentor and an inspiration."  (Richard Horstein letter.)  Deepa Prashant, NAI's Director of Corporate Planning and Treasury, recalls that "his generosity in giving people a chance to prove themselves" stood out.  (Deepa Prashant letter.)   Davia Nemkevich, the former Head of Human Resources, calls Mr. Goyal "one of the most honest, kindest, generous, good hearted men I have ever met."  She describes regularly meeting with Mr. Goyal to discuss employee issues and "no matter what the situation was or who the people we were dealing with, he would always ask me 'are we doing the right thing.'"  (Davia Nemkevich letter.)  Ms. Medeiros, Mr. Goyal's assistant, states: "this letter is being forwarded to advise the Court that I worked directly with Mr. Goyal, perhaps

closer than most.  I found his work ethic[] exemplary and his interactions with colleagues, employees, shareholders and others as above reproach."  (Dolores Medeiros letter).

Zachary Nelson, the CEO of an NAI subsidiary, and a former colleague at Sun Microsystems, explains that "[t]hrougout our time together, I saw Prabhat as the most honest, open and forthright colleague who upheld the highest level of ethics for the organization."  (Zachary Nelson letter).  Letters from other colleagues at Sun, where Mr. Goyal worked from 1988 to 1996, reflect these same thoughts.  (*E.g.*, letters from Jim Fitzgerald, John Lynch, Armando Viteri and Edward Zander.)  For example, Mary Anderson writes: "In the more than 30 years in the high-tech industry, I have never worked with a person of higher integrity…. I am proud to have worked with Prabhat due to his strength of character and would gladly work with him again in any endeavor."  (Mary Anderson letter.)

Mr. Goyal's concern for his business associates and colleagues did not diminished in difficult times.  One colleague recalls Mr. Goyal reaching out to him and providing him "some stability in my life both mentally and financially" after both were no longer working at NAI.  (Bill Lum letter.)  Mr. Goyal's wife recalls him coming home late one night from NAI and then turning to call a business associate who had lost his job.  "More than a little annoyed, I asked him why it couldn't wait until the next morning….  'No one calls you back,' Prabhat said, 'when things are going badly for you.  I want to make sure that I return his call today and answer his questions.'"  (Suruchi Mohan letter.)

**D.     A Productive Member of Society**

Mr. Goyal resigned from NAI in December 2000.  He was indicted in June 2004.  As described above, during the 52 months that have followed the indictment, Mr. Goyal endured his wife's heart attack and subsequent complications, his father's death half a world away and his own declining health.  Nonetheless, a pervasive theme repeated in many letters is Mr. Goyal's perseverance and his ability to remain positive and focused on others during the past few years despite mounting adversity in his own life.  (*E.g.*, letters from Seema Bhusan, Jim Fitzgerald, Roshni Goel, Ashok Bansol, Sridhar Jagannathan, Sanjay Gupta, Sanjiv Kaul, Neeru Biswas, Anup Banerjee, Nupur Agarwal, Zahra Ardehali and Bruce Fogel.)

In particular, the letter from Mr. Goyal's wife poignantly describes his efforts to leave his house and contribute to society despite the very real restrictions of an investigation and indictment.

> He put his soul as a volunteer into the El Camino Youth Symphony, but left before the indictment for fear that his legal troubles would taint the organization he loved.  He helped a student try to achieve his dream of building a company, but here again his legal troubles took him out of the game.  He shelved books at the Los Altos Public Library in an attempt to do something productive, until his conviction ended that.

(Suruchi Mohan letter.)

The beneficiaries of Mr. Goyal's efforts to remain productive all attest to his continued desire to be helpful and focus on others.  A friend whose daughter joined the youth symphony explains that after Meha became involved, "Prabhat soon became involved in the eternally struggling ECYS foundation, mentoring this non-profit organization, participating on their Board of Directors and contributing to their funds year after year."  (Sridhar Jaganathan letter.)

Vlad Debija, who turned to Mr. Goyal to provide business advice and encouragement as he started a company, describes Mr. Goyal as a personal mentor and a sounding board.  Mr. Goyal "never asked to be compensated for his efforts and time."  Instead, he "viewed his work with us as a child of love and it was obvious to anyone that he enjoyed mentoring entrepreneurs and being a good friend."  (Vlad Debija letter.)  Pradeep Tumati, a recent college graduate, describes working with Mr. Goyal on a start-up company they founded, and the lessons in professional decency Mr. Goyal instilled in him.  (Pradeep Tumati letter.)

Mr. Goyal's efforts to lead a productive life continue to this day.  A few months ago he accepted a consulting job providing general business advice to the executives at Global Bay, a small software company in New Jersey.  Before that, Mr. Goyal shelved books at the neighborhood library, both to be useful and "to teach his daughter the dignity of labor and humility."  (Ashok Bansal letter.)

## IV.     THE COURT SHOULD IMPOSE A BELOW-GUIDELINES SENTENCE UNDER 18 U.S.C. § 3553(a)

Section 3553(a) requires the Court to "impose a sentence sufficient, but not *greater* than necessary" to achieve the purposes set forth in 3553(a)(2):  (A) to reflect the seriousness of the

1    offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford

2    adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the

3    defendant; and (D) to provide for rehabilitation and training or needed medical care.  In addition, to

4    these four purposes, Section 3553(a) directs the Court to consider a number of other factors,

5    including the "nature and seriousness" of the offense, the defendant's "history and characteristics"

6    and potential sentencing disparities.

7           Considering these factors, the Probation Office recognized that the Guideline range of 37 to

8    46 months was far greater than necessary and recommended a sentence of one year and one day.  We

9    respectfully submit that 5 years probation, with a year term of home detention, as well as a fine and

10   substantial community service, is within the Court's discretion and will provide a punishment

11   sufficient, but not greater than necessary to achieve the goals of 3553(a).  Such a sentence recognizes

12   the seriousness of the offense conduct, while also acknowledging Mr. Goyal's otherwise exemplary

13   history and the permanent damage to his professional reputation, his career and his livelihood the

14   indictment and subsequent conviction has and will cause.  It also recognizes the significant role Mr.

15   Goyal has in the life of his daughter and wife, both of whom rely on him for emotional support.  *See*

16   *United States v. Anderson*, No. 07-11848, 2008 WL 525669, at *3 (11th Cir. Feb. 28, 2008)

17   (affirming 6 month home detention in a securities fraud case in part because defendant "supports

18   college-age children, lost his high-paying job" and "faces an uphill battle to regain his professional

19   credibility.")  Moreover, a term of in-home detention is similar to the sentences imposed on the two

20   other NAI employees who were prosecuted for related conduct.

21          As discussed at length above, Mr. Goyal's crime, while serious, is not accompanied by

22   malice and greed.  Rather, Mr. Goyal made erroneous accounting decisions.  Additionally, Mr.

23   Goyal was and remains a dedicated member of his family and his community.  Each of these facts

24   help support a below guideline sentence.  Mr. Goyal should not be punished as severely as a

25   defendant who acted from greed, stole or embezzled, or has a criminal history.[6]

26   _____

27         [6] Mr. Goyal's criminal history of zero at the age of 54 also weighs in favor of a downward
     variance.  Because the Sentencing Guidelines treat defendants in criminal history category zero and
28   category one the same, Mr. Goyal's guideline sentence is overstated.

As for the need for the sentence to protect the public from further crimes by Mr. Goyal, we respectfully submit that it is highly unlikely that Mr. Goyal will ever commit another crime of any sort.  Mr. Goyal's conduct was aberrant, and the fact that the Probation Officer also reached this conclusion further underscores our assertion.  *See* PSR at ¶ 83.  Indeed, as Judge Jenkins noted on the record after the verdict, Mr. Goyal has assiduously complied with his terms of release for many years.  XX Tr. 2018:8-13.  Mr. Goyal does not need rehabilitation or training, but he does have health issues, such as diabetes, that should be considered.  We address three remaining 3553(a) factors briefly below.

### A.    A Probationary Sentence Is Sufficient to Provide Just Punishment and Promote Respect for the Law

A probationary sentence of home detention is just punishment because Mr. Goyal's punishment in this case does not begin with or end with sentencing.  Over the eight years since he left NAI, Mr. Goyal has been punished on a daily basis.  Mr. Goyal's "career in finance effectively ended" when he left NAI, (PSR at ¶ 44), and Mr. Goyal's conviction has now irrevocably stained his reputation.

Moreover, Mr. Goyal has been shamed.  In his own words:

> … my family's world was devastated.  My wife has suffered a heart attack; my daughter has marched ahead bravely, trying to stay focused on her school and music with the optimism of youth that one day everything will be alright…. I feel ashamed that I have brought so much pain and suffering to my wife, daughter, family and friends. This is not what I worked so hard for and certainly not how I want to be remembered.

PSR at ¶ 21.  In fact, the Probation Officer also recognizes the affect the indictment and conviction has had on Mr. Goyal, concluding that he "has been *greatly* impacted by the prosecution of the offense."  PSR at ¶ 83 (emphasis added).

Mr. Goyal's gain ($120,000 to $200,000) does not reflect the same type of benefit you would often expect to see in a case of white collar theft or embezzlement.  Indeed, it is quite possible that Mr. Goyal would have received the same amount of bonuses during the relevant period even if NAI had used the alternative accounting methodology.  This is because the bonus calculation also includes bonuses he received in quarters where the revenue would have been greater if NAI had used sell-through accounting.  Moreover, it is impossible to say that NAI would not have awarded the same amount in bonuses to Mr. Goyal for the company meeting revenue targets on a sell-through accounting model.

1

Probation has significant punitive effect.  As the Supreme Court explained in *Gall v. United States*, 128 S.Ct. 586, 595-96 (2007), probationers are "subject to several standard conditions that substantially restrict their liberty."  Among other things "[p]robationers may not leave the judicial district, move, or change jobs without notifying, and in some case receiving permission from their probation officer or the court."  *Id.*  Finally, in considering the punishment now required, it is important to note that, whatever the sentence imposed, Mr. Goyal will face severe and continuing obstacles, including the resolution of a parallel SEC enforcement action and possible financial ruin as the result of a lawsuit by the company to repay "every dollar" expended in his defense.  Tr. of Scheduling Conf. at 15:17-21, *Goyal v. McAfee Inc.*, C.A. No. 3736-VCN (Del. Ch. May 9, 2008).

### B.     Adequate Deterrence Is Achieved Without a Jail Sentence

Section 3553(a)(2)(B) directs the court to consider the need for "adequate deterrence."  In this case, adequate deterrence will be achieved without a jail sentence.  Mr. Goyal serves as an example for any corporate executive who considers taking the risk associated with breaking the law. He is now a felon.  He has forfeited his career.  He has lost his professional reputation.  He is facing financial ruin.  A probation sentence, which includes a term of home confinement, will place further and substantial restrictions on his freedom and liberty.  "For individuals committing these types of crimes, the probability of being apprehended and incarcerated is a powerful deterrent in of itself, because the disutility of being in prison at all and the stigma and loss of earning power may depend relatively little on the length of imprisonment."  *United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J. dissenting) (citation omitted) ("It is widely recognized that the duration of incarceration provides little or no general deterrence for white collar crimes."); *see also* David Weisburd & Elin Waring, *White-Collar Crime and Criminal Careers*, at 151 (2001) (discussing the deterrent effect of indictment and prosecution on white collar offenders).

### C.     Imposing a Sentence of Imprisonment Would Create an "Unwarranted Sentence Disparity"

Finally, and quite significantly, the imposition of probation and home confinement will "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  The two other individuals prosecuted for

1   conduct arising out of these events at NAI both received probationary sentences with home

2   confinement.  *See* PSR at p. 3.

3          Former NAI controller, Terry Davis, pleaded guilty to one count of securities fraud under 15

4   U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5, and was sentenced in March 2008 to three

5   years probation, twelve months home confinement, a $50,000 fine and 500 hours of community

6   service.  Evan Collins, Davis' predecessor, pleaded guilty to insider trading in violation of 15 U.S.C.

7   §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5, and was sentenced in September 2007 to three years

8   probation, six months home confinement, a $10,000 fine and $250,000 restitution.  Sentencing Mr.

9   Goyal to a period of incarceration would create an unwarranted disparity.

10         The fact that Messrs. Davis and Collins held different titles than Mr. Goyal and cooperated

11  does not justify a disparate sentence.  *Accord United States v. Caperna,* 251 F.3d 827, 831-32 (9th

12  Cir. 2001) (rejecting the Government's argument that a court may not depart on the basis of co-

13  defendant sentence disparity if the co-defendant cooperated with the government and the defendant

14  did not).[7]  The Government offered Mr. Goyal a no-jail time plea in advance of trial with full

15  knowledge of the relevant facts and no expectation that he would testify against someone else.

16  While we expect that the Government will contend that Mr. Goyal should now receive a much

17  greater sentence his decision to exercise his Constitutional right to trial should not justify such a

18  difference.

19         Furthermore, the sentences of home confinement and probation issued to defendants Davis

20  and Collins are consistent with other sentences issued in other fraud and white-collar cases.  For

21  example, in *United States v. Whitehead*, the Court of Appeal affirmed a sentence of probation,

22  community service and a fine for a defendant who was convicted by a jury for illegally selling over

23  $1 million worth of counterfeit "access cards" that allowed purchasers to unlawfully watch satellite

24  television. 532 F.3d 991, 992 (9th Cir. 2008) (per curiam).  Whitehead's sentencing guideline range

25  was 41 to 51 months. *Id.*  In *United States v. Jamal*, a prominent real estate developer was sentenced

26

27         [7] *Carperna's* holding that disparate sentences may only be considered if the defendants were
    convicted of the same offense is no longer good law since it was based on the guidelines.

28

to 5 years probation and a $175,000 fine following his conviction for wire fraud at trial by a jury. 1:05-CR-00359 (D.D.C.) (docket).  In *United States v. McQuillan*, a senior executive received a 3 year probation sentence with a 6 months home detention and 28 days of community confinement after pleading guilty to a two-year conspiracy involving backdating software contracts to permit premature revenue recognition.  07-CR-00017, 2007 U.S. Dist. LEXIS 72717 (S.D.N.Y. Sept. 26, 2007) (describing illegal scheme).  *See also United States v. Ruff,* 535 F.3d 999, 1001 (9th Cir. 2008) (affirming 1 year half-way house sentence for defendant who pleaded guilty to stealing $650,000 from his employer and had a sentencing guideline range of 30 to 37 months); *Anderson*, 2008 WL 525669, at *2 (affirming home detention sentence for defendant who committed 18 acts of insider trading); *United States v. Dooley*, 3:04-CR-00387 (D. Or.) (docket) (former CFO sentenced for probation after pleading guilty for making false statement to auditors).  According to a December 2007 article that reviewed 1,236 white-collar sentences from 2002 to 2007, 28% of the defendants sentenced received no prison time and 47 percent were sentenced to a year or less in prison.  *See* David Voreacos and Bob Van Voris, *Bush Fraud Probes Jail Corporate Criminals Less Than Two Years,* Bloomberg, Dec. 13, 2007.

Additionally, many accounting frauds involving similar conduct to Mr. Goyal's, by former CFOs, did not result in any criminal proceeding all all.  For example, in *SEC v. Brady*, SEC Litigation Release No. 20005, 2007 WL 5057774 (Feb. 15, 2007), the SEC settled charges with former executives of i2 Technologies, Inc., including its Chief Financial Officer, for fraudulently misstating approximately $1 billion of software license revenue under SOP 97-2, "including over $125 million of revenue it never should have recognized" between 1999 and 2002.  In *SEC v. Take-Two Interactive Software, Inc.*, SEC Litigation Release No. 19260, 2005 WL 1367391 (June 9, 2005), the SEC settled fraud charges against the company's CEO, COO and CFO for 180 "parking" transactions used to inflate revenue improperly under SOP 97-2 and using "fraudulent invoices" to

disguise the transactions.[8]  While the decision to prosecute criminally requires significant judgment and no two cases are the same, the fact that similar matters have been litigated civilly should be considered in fashioning an appropriate punishment.

## V.      RESPONSE TO PRE SENTENCE REPORT

The parties submitted objections to the draft PSR on September 15, 2008, and the Probation Officer conducted a conference with both parties on September 17, 2008.  Mr. Goyal appreciates the Probation Officer's attention to this case and almost all of the objections were either resolved during the conference or have been addressed above.  As the Probation Officer states, there are differences between the parties over the facts and their interpretation, and many of these differences will be raised and adjudicated on appeal.  Mr. Goyal does not request an evidentiary hearing.  Pursuant to Local Rule 32-5, however, we address certain statements in the PSR where there was simply no evidence at trial to support the proposition; where the statement is objectively incorrect; or where the statement reaches factual conclusions that do not necessarily follow from the jury's verdict.

Paragraph 11.  Paragraph 11 states that "NAI met its revenue goals *primarily* through large software transactions with the company's distributors."  (emphasis added).  The trial was solely about transactions with one distributor, Ingram.  No evidence was introduced by the Government as to the total amount of NAI's revenue that was attributable to sales to that distributor, which would have required evidence of the revenue recorded and reserves taken from the sales, or the relative value of all of NAI's other sources of revenue.  The lack of evidence about the materiality of NAI's

---

[8]  Other examples include:  *SEC v. Sweeney*, 2008 SEC Litigation Release No. 20493, 2008 WL 680739 (Mar. 13, 2008) (settling fraud charges against CFO and CEO for fraudulent recognition of software revenue in violation of SOP 97-2); *SEC v. Graham*, 2007 SEC Litigation Release No. 20163, 2007 WL 1814115 (June 22, 2007) (settling fraud charges against CFO for improperly recognizing revenue on sales of hardware and software to distributors in violation of SOP 97-2); *SEC v. System Software Assocs., Inc.*, 2002 SEC Litigation Release No. 17770, 2002 WL 31236425 (Oct. 7, 2002) (settling fraud charges against CFO and others who recognized software sales in violation of GAAP); *SEC v. Malmstedt*, SEC Litigation Release No. 17524, 2002 WL 1021415 (May 21, 2002) (settling fraud charges against two individuals who caused their employer to record revenue on contingent sales of software).

1  deals with Ingram is discussed in Mr. Goyal's Motion for Release Pending Appeal at 13-14

2  (Dkt. 325.)

3      Paragraph 12.  Paragraph 12 addresses SOP 97-2, the accounting standard in question, and

4  states that according to the accounting rule "revenue from a sale of software may not be recognized

5  if the sale was subject to a right of return" and may not be recognized "if the sale price was not fixed

6  and determinable."  These statements are inaccurate.  Revenue may be recognized from a sale with a

7  right of return if the amount of the future return is reasonably estimable, and the Government

8  conceded this at trial.  XVI Tr. 1843:11-13 (Gov't Summation) (explaining that a right of return is

9  "fine if you could reasonably estimate what those returns were going to be").  Revenue may also be

10  recognized if the sale price was fixed *or* determinable, and the PSR correctly states this rule at

11  paragraph 14 (number 2).  *See also* GX 685 (Government summary exhibit stating "fixed or

12  determinable").  These rules emphasize the judgments and estimates that are necessary when

13  applying 97-2 to any transaction.  Additionally, as paragraph 14 in the PSR explains, these estimates

14  are reflected in reserves.  The Government, however, put on no evidence to establish that NAI

15  lacked appropriate reserves.  *See* Motion for Release Pending Appeal at 12-13.

16      Paragraph 14 (Number 2).  Paragraph 14 (number 2) correctly states that concessions may be

17  appropriate if reasonably reserved for but it omits this point with respect to "guaranteed margins."

18  Paragraph 14 also states that "these sales conditions [referring to discounts and terms such as rights

19  of return] were not included in the distribution agreements between NAI and IM."  The formal

20  distribution agreement, however, permitted amendment by agreement of the parties (GX 631 at 14),

21  and PWC knew that NAI was offering price discounts that were not described in the distribution

22  agreement (VI Tr. 874:11-14 (Stavers)).

23      Paragraph 15.  Paragraph 15 follows the Government's theory of the case.  However, it also

24  makes assertions of fact that are incomplete and unnecessary to the jury's verdict.  *First*, it states that

25  "testimony at trial revealed NAI's Board of Directors and outside PWC auditors were not informed

26  of NetTools role in satisfying verbal and written side agreements with customers."  While PWC

27  employees testified that they were not aware of NetTools, contemporaneous documents generated

28  and produced to the Government by PWC indicate that it was informed of NetTools and its manner

of operation.  (DX 881 at 46-48 (PWC review including flow chart describing NetTools' operations and processes)).  The jury need not have reached any conclusion about NetTools to consider the Government's case that the buy-in letters invalidated the accounting.  *Second*, the same paragraph states that "[n]either were [NAI's Board of Directors and outside PWC auditors] aware that NAI paid IM excess inventory fees nor provided with the buy-in letters."  There was evidence, however, that terms of the letters were provided to PWC in summary fashion.  (DX 175 (PWC workpaper summarizing concessions provided to distributors, such as marketing funds, discounts from invoice, price protection discounts, rebates, and meet-competition discounts)); VII Tr. 917:5-920:9 (Stavers).

## VI.   PROPOSED GOYAL SENTENCE

Mr. Goyal's crime was atypical.  Mr. Goyal had no prior criminal record and by all accounts will not commit another crime.  He has already suffered the loss of his career and faces further obstacles.  He is a devoted family man and a productive member of his community as well as society.  Other individuals involved in the same events received 3 years of probation and 6 and 12 months home confinement.

For all the reasons stated above, we respectfully submit that a 5 year term of probation, with a year of home detention, 500 hours of community service and a fine is sufficient, but not greater than necessary to meet the purposes of § 3553(a).  With respect to the community service aspect of this sentence, Mr. Goyal has confirmed that he is eligible – and will be accepted – to work at a number of charitable organizations in the area.[9]

A term of incarceration is not warranted in every case that goes to trial and results in a conviction.  This is one of those cases.

---

[9]  Specifically, Mr. Goyal has identified a volunteer opportunity at Ellipse HIV Support Services, which is an organization that provides supplemental meals and referral services to persons living with HIV/AIDS.  Ellipse has expressed a specific need for a volunteer to assist clients with personal budgeting, a service that would allow Mr. Goyal to share his professional training and financial skills with those in need.  Mr. Goyal has further identified meal service volunteer opportunities at the Second Harvest Food Bank in Santa Clara and San Mateo Counties.  These meal service opportunities would enable Mr. Goyal to serve the most needy and vulnerable citizens of his community while also meeting his obligations to the Court.

1    Dated: September 25, 2008                    Respectfully submitted,

2                                                PRABHAT K. GOYAL

3

4

5

/s/  Stephen A. Jonas
WILMER CUTLER PICKERING
  HALE AND DORR LLP
Stephen A. Jonas
Ronald C. Machen (admitted *pro hac vice*)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28